917 F.2d 1355
 Theresa K. GOODEN, Plaintiff-Appellee,
v.
HOWARD COUNTY, MARYLAND, c/o Elizabeth Bobo, County
Executive; Nancy Yeager, individually and in her capacity
as a police officer of the Howard County Police Department;
Frank N. Salter, individually and in his capacity as a
police officer of the Howard County Police Department;
William J. Pollack, individually and in his capacity as a
police officer of the Howard County Police Department,
Defendants-Appellants,
and
Frederick W. Chaney, in his capacity as Chief of Police of
the Howard County Police Department; Unknown and
Unidentified Police Officers of the Howard County Police
Department, hereinafter referred to as John Doe I, John Doe
II, John Doe III, John Doe IV and John Doe V, who were
present at and involved in the incidents complained of
herein, individually and in their capacity as Police
Officers of the Howard County Police Department, Defendants.
 No. 89-2470.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 6, 1990.
Decided Nov. 9, 1990.
 
 Wilkinson, Circuit Judge, filed dissenting opinion.
 Marna Lynn McLendon, Sr. Asst. County Sol., argued (Barbara M. Cook, Howard County Sol., Ellicott City, Md., on brief), for defendants-appellants.
 Cheryl Lynn Ziegler, Morgan, Lewis & Bockius, argued (William L. Gardner, Howard T. Weir, Morgan, Lewis & Bockius, Roderick V.O. Boggs, Washington Lawyers' Committee for Civ. Rights Under Law, Washington, D.C., on brief), for plaintiff-appellee.
 Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 PHILLIPS, Circuit Judge:
 
 
 1
 Howard County, Maryland, Police Officers William Pollack, Frank Salter, and Nancy Yeager appeal the district court's interlocutory order denying them summary judgment on qualified immunity grounds in Theresa Gooden's claim against them under 42 U.S.C. Sec. 1983.[1] Gooden brought this action against the officers, the county, and the county police chief after the officers seized her from her apartment and took her to a hospital for an emergency psychiatric evaluation. Because the record discloses genuine issues of fact about the information the arresting officers reasonably had available, materially bearing on the ultimate legal question of whether they reasonably could have believed their actions lawful in light of clearly established law, we affirm the district court's order.
 
 
 2
 * The nature of our inquiry on this appeal necessitates a rather detailed summary of the summary judgment record.
 
 
 3
 Denise Beck (now Denise Beck Stephens) has asserted by affidavit that in early 1987 she began hearing loud noises coming from the apartment above hers at the Chase Clary apartment complex in Columbia, Maryland. These noises, Beck stated in her affidavit, included loud screaming, yelling, and "general commotion." J.A. at 47. Uneasy about confronting the occupant of the apartment above her, J.A. at 47, Beck, a white woman, complained to the apartment manager, who in turn wrote a letter to Theresa Gooden, the black woman who occupied the apartment directly above Beck's, asking that she keep the noise level to a minimum. J.A. at 130. Gooden, a 28-year old employee of the CIGNA Health Plan, had recently moved to Columbia from Michigan.
 
 
 4
 At 8:30 a.m. on February 21, 1987, Beck called the police, asking them to respond to what Beck said she took to be a violent domestic dispute occurring in the overhead apartment. She claims to have heard loud screaming and a female voice telling a male that her life had been ruined and that she would kill him. Howard County Police Officers Nancy Yeager and William Pollack, both white, responded to the call, first checking with Beck, then visiting Gooden's apartment overhead. Beck claims that the noises stopped once the officers made contact with Gooden. J.A. at 48. Upstairs, Officers Yeager and Pollack spoke briefly with Gooden. Gooden told them that she had been asleep and was awakened only by their loud knocking and that she neither caused nor even heard any disturbance. J.A. at 30, 37, 51. Gooden claims that she consented to a search of her apartment, after which the officers, finding no one but her there, said that "obviously the screams were not coming from her apartment." J.A. at 51. According to Gooden, Officer Pollack left, but Yeager stayed behind to question her, using an "accusatory and rude" tone. J.A. at 51. Yeager states that Gooden, though apparently cooperative, was "evasive and hesitant" in her answers. J.A. at 30. Based on Beck's certainty about having heard two voices, Yeager checked with the apartment manager and confirmed that, in fact, Gooden lived alone in the apartment. Gooden felt at the time that she was being targeted for racial harassment by someone in the apartment complex, and two days later reported the police's visit to Officer David Steves of the Howard County Police.
 
 
 5
 At about 10:30 p.m. on March 2, Beck again called the police complaining of noises from the apartment above. Officer Yeager, then on patrol with Officer Frank Salter, responded at 10:47 p.m. to the "woman screaming" call initiated by Beck. Officers Yeager and Salter claim to have heard a loud "blood-chilling" scream upon entering the first level of the apartment building where Beck and Gooden lived, convincing them that someone was being harmed. J.A. at 30, 41. The officers went immediately to the third floor hallway and stood outside Gooden's apartment. There, they claim to have heard another scream, this coming from within Gooden's apartment. J.A. at 31, 42.
 
 
 6
 Gooden answered the officers' knock at her door. The police officers and Gooden give quite different accounts of the ensuing encounter. According to Yeager, Gooden, when first asked about the screaming, denied having made any noise, but then admitted that she had just burned herself ironing, and had screamed. J.A. at 31. Yeager states that she then asked to see the iron and ironing board, and discovered that there were no clothes on the ironing board and that the iron itself was cold to the touch. Yeager also states that she asked to see Gooden's burn, and that Gooden "just replied that it didn't matter and finally totally refused to have me look at the burn." J.A. at 31. Yeager did not find the apartment disorderly, though she comments that it struck her as odd that Gooden, who had described herself as a "loner" during the February 21 encounter, had "an inordinate number of cards and letters" displayed. J.A. at 31. Yeager stated in affidavit that she still believed that Gooden was not being candid and that in fact Gooden was at risk of harm from herself or someone else. J.A. at 31-32.
 
 
 7
 Gooden's description of this encounter contrasts markedly with Yeager's. She explained that she had washed her laundry that evening until about 9:00 p.m. and was in her apartment for the next couple of hours, putting clothes away and ironing, most of the time talking on her cordless phone. While on the phone to a Marc Brogdon, some hot water from the iron splashed onto her arm, causing her to "yelp for a moment." J.A. at 52. She then heard a loud knock on the door and, opening it, saw Yeager and Salter "crouching with billy clubs in hand." She told Brogdon the officers were there and hung up.[2] According to Gooden, the officers accused her of screaming for the last two weeks, then unsuccessfully searched the apartment for another person. Upon questioning, Gooden explained that she had just yelped from an ironing spill, but that she did not think it loud enough to justify police intervention. In contrast to Yeager's story, Gooden said that she showed the officers a blouse on the ironing board and a plugged-in iron, and moreover that she pointed out the wet spot on the blouse where water had spilled and the red mark on her arm, but that Yeager ignored them, demanding instead to see "a burn." J.A. at 54. Gooden states that as the officers were leaving, Salter said, "Next time we come, we'll stay longer," to which Gooden replied that they better have a warrant then. J.A. at 54. Yeager and Salter deny that Salter made any such comment.
 
 
 8
 The officers went back downstairs to speak to Beck in her apartment. Soon thereafter, they heard and felt, it is claimed, the same noises and commotion from the apartment above that Beck had described: a male and female shouting at each other (but the two voices never shouting simultaneously), and "loud thuds" that caused even the chandelier in Beck's apartment to shake. J.A. at 32. Based on what she heard, Yeager thought that Gooden might have a "multiple personality," talking back and forth in alternating male and female voices, and that she might be hurling herself against the walls. Gooden, however, claims that during the time just after the officers left she called her mother in Michigan and spoke for ten minutes. Her long-distance bill corroborates this. She then called Officer Denise Carter at the Howard County Police Department to inquire about registering a complaint concerning the officers' visit. J.A. at 54. Officer Carter stated in deposition testimony that she and Gooden had "a very calm conversation." J.A. at 218.
 
 
 9
 Assertedly because of what they had heard, Yeager and Salter returned to Gooden's apartment "after contacting all residents that were present in the building and failing to find any other source of the violence." J.A. at 32. According to Yeager, Gooden appeared to be crying when she answered the door and asked, "Why are you doing this to me?" Yeager pressed Gooden on her emotional state, but Gooden was "unresponsive," offering no explanation for the screaming Yeager had heard and looking "nervous as well as uncomfortable" to Yeager. J.A. at 33. Sergeant Pollack and other backup officers had by then arrived on the scene and were in the hallway. Yeager and Salter told Pollack that what they perceived as Gooden's bizarre behavior--the possibility of a "split personality" with two voices talking to each other, the banging against the walls, and Gooden's evasive failure to explain the noises--would justify petitioning for an emergency psychiatric evaluation. The officers filled out the petition, arrested and handcuffed Gooden, and transported her to a nearby hospital. Gooden stated that when the officers handcuffed her behind her back, they refused to let her get a coat or purse and, despite her plea, would not make calls to verify her claim that she had not been screaming but instead had been on the phone with Marc Brogdon, her mother, and Officer Carter throughout the evening.
 
 
 10
 Another resident of the apartment building, Patrick Cummings, offered affidavit testimony about what happened that evening. Cummings had never had any communication with Gooden, though when he had seen her, "she always appeared very professional and responsible." J.A. at 71. Cummings asserted that he saw police cars pulling into the building's parking lot on March 2 and watched from his balcony. One officer asked him where the commotion was, and he pointed to the apartment directly below Beck's, where a married white couple named Dowling lived. J.A. at 68. Cummings averred that his apartment shared parts of common walls with both Beck's apartment and the Dowlings' and that on that last night--and on many occasions before (and once after)--he had heard violent domestic disturbances from the Dowlings' apartment. Once he heard them screaming and saw shadows of what looked like a man and woman fighting. Another time on an early morning in late February, he heard a female voice shouting, "I've been married to you.... My life has been miserable. I don't have any money. My life is ruined." J.A. at 68.
 
 
 11
 According to Cummings, Beck called for him and his wife to come tell the police what had been happening. As he went to Beck's apartment, he saw Gooden being placed in the police car, and observed that she was speaking in a normal voice and, though upset, was "clearly not out of control." J.A. at 69. Cummings immediately told the officers at Beck's apartment that they had the wrong person--that it was the Dowlings, not Gooden, who was making the noise. He stated that Beck, he, and his wife compared what they had heard and confirmed that it was in fact the Dowlings. Beck, he asserted, then exclaimed, "Oh my God, they took the wrong person." J.A. at 70. (Beck, however, states in her affidavit that she believed then and continues to believe that the noise came from above her. J.A. at 48.) Cummings then led Officers Yeager and Pollack to the Dowlings' apartment, directly below Beck's. As recounted in Yeager's deposition testimony, Mr. Dowling had been drinking, and he and his wife had been fighting. J.A. at 149-50. Yeager told them to keep the noise down, filled out a report, and took no further action. J.A. at 150-51. Cummings concluded from all his discussions with and observation of the officers that they had a "preconceived notion" that Gooden had made the noise and "refused to believe anything that contradicted their belief." J.A. at 70. None of the officers' affidavits referred to the incident with Cummings and the Dowlings.
 
 
 12
 After waiting about two hours, Gooden was examined at Howard County General Hospital by Dr. Barton Hershfield. The doctor found no signs of mental illness. He noted further that Gooden did not appear disheveled and that she acted rationally and cooperatively during the examination. She was released after the examination, and declined a ride home offered by the police.
 
 
 13
 Gooden brought an action against Howard County, the county police chief, and Officers Pollack, Salter, and Yeager. She alleged that all of the defendants deprived her of her fourth and fourteenth amendment rights, and she sought damages under 42 U.S.C. Sec. 1983. She claimed further that the police officers were liable under 42 U.S.C. Sec. 1985(3) for engaging in a racially motivated conspiracy purposefully to deprive her of the equal protection of the laws. She also asserted pendent state law tort claims for assault, battery, and false arrest against the county and the officers. All defendants moved to dismiss the claims. The county argued that it was not liable on the section 1983 claims because Gooden had failed to show that the officers' conduct was attributable to a policy or custom of the county. The officers claimed qualified immunity.
 
 
 14
 The district court treated the motions to dismiss as motions for summary judgment and considered the affidavits and deposition testimony in the record. After hearing argument, the court held in an oral opinion that "viewing the facts and inferences in the light most favorable to the plaintiff, a jury could conclude that no reasonable officer could have believed in the lawfulness of subjecting Gooden to an involuntary psychiatric examination." Tr. of Hearing on Motions to Dismiss at 65-66. The court noted in particular several discrete factual issues that would bear directly on the objective legal reasonableness of the officers' actions: (1) whether a reasonable officer would have concluded that Gooden was a "multiple personality," talking to herself in different voices and hurling herself against the wall, in light of evidence that she acted calmly and rationally, that neither she nor her apartment evidenced violent activity, and that a loud domestic disturbance was going on directly below Beck at the time; (2) whether a reasonable officer would have concluded that she was a danger to herself in light of evidence that she showed no signs of having been harmed in the intervals between the times the officers came to her apartment; and (3) whether a reasonable officer would have permitted Gooden's continued detention after Patrick Cummings explained the incident to them. Id. at 66-67. The court noted that if the jury believed all of Gooden's evidence, the officers' conduct would be "clearly unreasonable by any standard." Id. at 67. After delivering his oral opinion, the district judge informally summarized his view of the case, based on the forecast of evidence in the record: "Let me say, and I expect my opinion pretty well spells it out ... if there was ever a case that cried for a trial, this is it.... On the face of everything I've read and everything I've heard, this is what juries are for." Id. at 71.
 
 
 15
 The officers now appeal from an order denying a later motion to amend or alter judgment.
 
 II
 
 16
 The officers contend that the district court erred in denying them summary judgment based on qualified immunity. Specifically, they contend that the law governing the seizure of a person for an emergency psychiatric evaluation was not so clearly established that a reasonable officer could have known what conduct the Constitution proscribed. Alternatively, they contend that if we find that the law was "clearly established" in this area, we should hold as a matter of law that a reasonable officer could have believed this conduct lawful.
 
 
 17
 We briefly review the principles that guide our consideration of the qualified immunity defense when asserted in a summary judgment motion, then address these alternative contentions.
 
 
 18
 * The defense of qualified immunity generally protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity thus affords a defendant government official broader protection than does the merits defense that no constitutional violation occurred. Regardless of whether the constitutional violation occurred, the defendant should prevail if the right asserted by the plaintiff was not "clearly established," in the "particularized" sense that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Even where the rights allegedly violated may be clear at some level of abstraction, the defendant should prevail if a reasonable officer could have believed his particular conduct lawful, a standard requiring a court to undertake an "objective (albeit fact-specific)" inquiry into the legal reasonableness of the conduct. Id. at 641, 107 S.Ct. at 3040.
 
 
 19
 The qualified immunity test thus necessitates three discrete determinations: the identification of the specific right allegedly violated, the determination of whether that right was so "clearly established" as to alert a reasonable officer to its constitutional parameters, and the ultimate determination of whether a reasonable officer could have believed lawful the particular conduct at issue. Collinson v. Gott, 895 F.2d 994, 998 (4th Cir.1990) (Phillips, J., concurring). The first two determinations present pure questions of law. The third, though ultimately a legal question, may require subsidiary factual determinations. If a reasonable officer could have believed his conduct legal under one version of what occurred, but could not have so believed under a conflicting version of the conduct, then further factual development will be necessary. Id. Often trial can yet be avoided if carefully limited discovery reveals that there are no genuine issues of fact concerning the conduct at issue, permitting the court then to rule as a matter of law on the third and ultimate question. See Anderson, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6 (1987). In some instances, however, material subsidiary questions of fact regarding an official's conduct, or the information he reasonably possessed at the time he acted, will still be genuinely in dispute after full discovery, and summary judgment must be denied. In reviewing an immediately appealable interlocutory order denying summary judgment, we review both the pure legal issues respecting the existence of clearly settled constitutional law in relation to the defendant's conduct, and also whether there are genuine issues of material fact respecting the official's conduct which require resolution before its objective reasonableness can be assessed. Turner v. Dammon, 848 F.2d 440, 445-47 (4th Cir.1988).
 
 B
 
 20
 The officers first contend that they should prevail on qualified immunity because the paucity of cases discussing constitutional standards for a seizure preliminary to an emergency psychiatric evaluation suggests that there was no clearly established law guiding their conduct. This lack of case law guidance, they suggest, created a "legitimate question," see Tarantino v. Baker, 825 F.2d 772, 775 (4th Cir.1987), whether a fourth amendment standard lower than probable cause to arrest might apply to a situation where the police act on a perceived psychiatric emergency.
 
 
 21
 At the outset, we note that the parties agree that the source of Gooden's constitutional right against what occurred here was the fourth amendment. Although confinement by state action of the mentally ill is generally analyzed under the due process clause of the fourteenth amendment, see O'Connor v. Donaldson, 422 U.S. 563, 573-76, 95 S.Ct. 2486, 2492-94, 45 L.Ed.2d 396 (1975) (state cannot constitutionally confine a nondangerous mentally ill person capable of living safely in freedom), we address here the analytically distinct right to be free from an unreasonable governmental seizure of the person for whatever purpose. A citizen enjoys that right regardless of the purpose for which the state acts, see In re Barnard, 455 F.2d 1370, 1373 (D.C.Cir.1971) ("[T]he Fourth Amendment's prohibition is not limited to cases involving arrests."); Brown v. Fauntleroy, 442 F.2d 838, 842 (D.C.Cir.1971) (in juvenile case where defendant in custody of mother, court found "the right to be free of a seizure made without probable cause does not depend upon the character of the subsequent custody"), and although the right may overlap somewhat with the right to due process, governmental conduct amounting to seizure of the person must be scrutinized under the more specific rules deriving from the fourth amendment. See Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1138 & n. 5 (4th Cir.1982); McKinney v. George, 726 F.2d 1183, 1187 (7th Cir.1984).
 
 
 22
 As indicated, the officers do not contest the general applicability of the fourth amendment, but argue that the lack of case law applying fourth amendment standards in the context of seizure of the mentally ill gave rise to a "legitimate question" about whether some standard lower than probable cause might justify such a seizure as reasonable. Without suggesting that summary judgment would be warranted if a lower standard did apply, we simply do not think there was a legitimate question on this point. We have found few cases that discuss the fourth amendment standard in the context of seizure of the mentally ill, but all have recognized the otherwise plainly evident proposition that such a seizure is directly analogous to a criminal arrest and must therefore be supported by probable cause.[3] See, e.g., In re Barnard, 455 F.2d at 1373; McKinney, 726 F.2d at 1187; Harris v. Pirch, 677 F.2d 681, 686 (8th Cir.1982).
 
 
 23
 Indeed, a federal court in these officers' own district had earlier noted, as though it were self-evident, the applicability of the federal constitutional probable cause standard in the mental health seizure context. In Gross v. Pomerleau, 465 F.Supp. 1167 (D.Md.1979), a plaintiff sued a police officer who arrested her and committed her briefly to a psychiatric unit after she, according to the officer's account, became hysterical during a routine traffic stop. The district court observed that the question of an underlying constitutional violation would turn on whether the officer had probable cause to believe in the woman's need for emergency psychiatric evaluation. Gross, 465 F.Supp. at 1171 ("At issue, then, is whether plaintiff's behavior at the time of the arrest was sufficient to justify a finding of probable cause for her eventual commitment to the Unit."). In its analysis of police department procedures for making such a seizure, the court noted the lack of any meaningful distinction between the procedures that govern seizure preceding civil commitment and those governing criminal arrest of a mentally ill person. Id. at 1172 ("common sense suggests that both procedures were intended to deal with the same type of individual, i.e., the mentally disturbed person, although in different contexts"). The gravity of the constitutional harm to a person wrongly seized for mental illness lay behind the court's concern for requiring proper procedural and substantive standards before such a seizure.[4] Id. at 1173 ("Commitment to an Evaluation Unit, even for a day, involves a loss of liberty, privacy, free association and could well have the effect of creating a stigma against the person confined."); id. (such a deprivation can create "a stigma of mental illness which can be as debilitating as that of criminal conviction") (quoting Stamus v. Leonhardt, 414 F.Supp. 439, 444 (S.D.Iowa 1976)).[5]
 
 
 24
 In sum, we think the fourth amendment's applicability in this situation was sufficiently "clearly established" that no reasonable officer could have believed it lawful to seize Gooden unless he had probable cause to believe that she was both mentally ill and that her mental illness made her a danger to herself or others. See O'Connor, 422 U.S. at 575-76, 95 S.Ct. at 2493-94. As noted, however, the existence of this "clearly established" law does not end our inquiry on summary judgment; the question remains whether there exist on the record as a whole genuine issues of material fact bearing on the objective legal reasonableness of the officers' actions in light of the law. Turner, 848 F.2d at 444. The availability of qualified immunity turns not on whether the officers actually had probable cause but whether the circumstances made it reasonable for them to think they did. Their immunity defense therefore depends critically and inescapably on resolution of factual questions about what circumstances reasonably appeared to the officers, what information they reasonably could be expected to have had and gathered, and what conclusions they reasonably could have reached and acted on in those circumstances and with that information. See Sevigny v. Dicksey, 846 F.2d 953, 957 (4th Cir.1988) (qualified immunity defense may turn on factual determinations about how a reasonably informed officer, acting reasonably under the circumstances, would have perceived the unfolding events). As we think our detailed account of the facts of record shows, and as the district court cogently pointed out in denying summary judgment, a number of critical facts remain hotly disputed at this stage.
 
 
 25
 Without recapitulating the welter of conflicting versions of the critical events leading to Gooden's being taken into custody, it suffices to point out that if the reality of what was taking place at the times in issue was as Gooden's evidence tends to show, it is fairly disputable whether these officers reasonably could have perceived things to be as they testified they were. More specifically, if Cummings' version of events were accepted--that the probable source of the noises of altercation upon which the officers acted was the Dowlings' quarters rather than Gooden's and that Cummings so advised the officers who then failed to verify this possibility--it is fairly disputable whether they reasonably could have believed their conduct to be justified. See Sevigny, 846 F.2d at 957 & n. 5 (in assessing reasonableness of officer's perception of probable cause to arrest, officer must be charged with knowledge of relevant facts readily available to officer acting reasonably under circumstances). Resolution of these and related factual issues can only be made on the basis of credibility determinations respecting flatly conflicting versions of critical historical facts.
 
 
 26
 As the district court aptly put it, "this is what juries are for." Despite the desirability of resolving qualified immunity claims without trial, that sometimes is not possible. In such cases, this extraordinary defense, still more favorable than a defense on the merits, see Sevigny, 846 F.2d at 956 & n. 3, must be submitted to a trier of fact.[6] In so holding here, we of course express no opinion as to how it should there be resolved.
 
 AFFIRMED
 WILKINSON, Circuit Judge, dissenting:
 
 27
 Because the majority misapprehends the nature of qualified immunity from suit under 42 U.S.C. Sec. 1983, I dissent. We are all agreed that the relevant question in this case is the objective one of whether a reasonable officer could have believed his actions "to be lawful, in light of clearly established law and the information the ... officers possessed." Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). We are not agreed, however, as to how the standard of "objective reasonableness" must be applied to situations in which the police are suddenly confronted with the confused scene of a crime or disturbance as were the officers in this case.
 
 
 28
 The majority's misapprehension of qualified immunity is threefold. First, it ties qualified immunity to what actually transpired rather than to the reasonableness of the officers' perceptions of what took place. Here, the officers reasonably relied upon the complaint of an apartment resident whom they had no reason to distrust and whose repeated reports of violent disturbances were corroborated by the officers' own observations. Second, the majority adopts a standard of qualified immunity that leaves little room for summary judgment in cases of mistaken searches and seizures, even where the mistake is a reasonable one. In this regard, the majority's view that neither Gooden nor her neighbors were in imminent danger is nothing more than an impermissible exercise in hindsight. Had someone been seriously injured in this incident, the consternation over alleged police misconduct would have been every bit as great. Finally, the majority defines "clearly established" law at a level of generality so broad as to discard qualified immunity in cases where official action is open to reasonable debate. I shall address these three errors in turn, the cumulative effect of which is to leave the defense of qualified immunity in a rubbled state.
 
 I.
 
 29
 The majority believes there are genuine issues of fact as to the reality of what occurred at the Chase Clary apartment complex the night of March 2 and therefore as to what "information the ... officers possessed." Anderson, 483 U.S. at 641, 107 S.Ct. at 3040. It regards the actual reality of what transpired and the reasonableness of the officers' perceptions of that reality to be inextricably linked. If this be so, a jury trial will be required in almost every case where the witnesses at the typically confused scene of a crime differ over what occurred. In my judgment, the majority places too much emphasis on the illusory search for what actually transpired and too little on the officers' reasonable perception of the jumbled events on the evening in question.
 
 
 30
 The majority insists on sending this case to trial so that a jury can make "credibility determinations respecting flatly conflicting versions of critical historical facts." Maj.Op. at 1364. It believes that the reasonableness of the officers' perceptions cannot be determined until the reality of what happened on March 2 is determined by a jury: "if the reality of what was taking place at the times in issue was as Gooden's evidence tends to show, it is fairly disputable whether these officers reasonably could have perceived things to be as they testified they were." Maj.Op. at 1363. In the majority's view, a definitive picture of events must be procured before the reasonableness of the officers' conduct can even be assessed: "More specifically, if Cummings' version of events were accepted--that the probable source of the noises of altercation upon which the officers acted was the Dowlings' quarters rather than Gooden's and that Cummings so advised the officers who then failed to verify this possibility--it is fairly disputable whether they reasonably could have believed their conduct to be justified." Maj.Op. at 1363.
 
 
 31
 However, in determining "the information the ... officers possessed," Anderson, 483 U.S. at 641, 107 S.Ct. at 3040, the court must determine what the police reasonably perceived the reality to be. If the object of lawsuits such as these is to deter unlawful conduct, then we must tie the reasonableness of a police response to the reasonableness of police perceptions. Reasonable responses based upon reasonable perceptions is all that can be expected of persons required to make difficult discretionary judgments at a chaotic scene. See Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). One district court has explained that to avoid becoming immersed in the sort of subjective inquiry that Harlow sought to avoid, "the court must accept as true the claims of the defendant with respect to the facts assertedly relied on by the defendant in determining that he had probable cause ..., in the absence of evidence to the contrary." Howard v. Vandiver, 731 F.Supp. 1290, 1296 (N.D.Miss.1990).
 
 
 32
 Inevitably there are disputed facts as to what actually occurred on the night of March 2; but as to the officers' perceptions, the area of dispute is considerably circumscribed. In fact, it is undisputed that the police officers perceived the screams to be coming from Gooden's apartment. The fact that there is a dispute as to where the screams originated in reality does not raise a factual dispute as to what these officers perceived. The majority may be correct in assuming that the acoustics of the building were such that the screams that the officers perceived to be coming from Gooden's apartment were really coming from some place else. There is no evidence, however, that their mistaken (if in fact it was mistaken) perception was unreasonable.
 
 
 33
 This is not a case of action impulsively taken or conclusions hastily drawn: this seizure occurred only upon the officers' second visit to the apartment complex and during their second contact with Gooden on the evening in question. In effecting the seizure, the officers followed state procedure which permitted them to petition for an emergency evaluation of an individual where the officer "has reason to believe that the individual has a mental disorder and that there is a clear and imminent danger of the individual's doing bodily harm to the individual or another." Md. Health-General Code Ann. Sec. 10-622(a) (1990). The fact that the officers acted under state procedure is relevant to the federal question of "objective reasonableness" provided, of course, that there was evidence of imminent danger to Gooden or others as required by state law.
 
 
 34
 Here there plainly was. The police had twice been called to the apartment complex by Denise Beck, who unequivocally stated that blood-chilling screams were coming from the apartment above her. The first time Officers Pollack and Yeager came to the complex to investigate Beck's report, they prudently did nothing. The second time the police responded to Beck's call, Officers Salter and Yeager heard a horrible scream immediately upon entering the apartment building that they too thought was coming from Gooden's apartment. After running up the three flights of stairs to Gooden's door, they heard yet another scream from within. When questioned, Gooden declared that she had "yelped" when she burned herself ironing. (Whether this explanation was in any sense corroborated is a matter of dispute.) The police officers then conducted a door-to-door canvass of the complex and found no alternative explanation than that the screams were coming from Gooden's apartment. Standing in Beck's apartment after their first contact with Gooden that evening, Officer Yeager, Officer Salter and Beck again heard violent screams as well as loud thumps and saw the chandelier swing. While Officer Salter was in the hallway, Officer Yeager heard a male voice and a female voice yelling but never heard both voices simultaneously. It was not until the very last minute that the possibility that the screams came from below Beck's apartment was even raised. How the officers can be faulted when their own investigation and observations corroborated Beck's reports is beyond me. As we have earlier noted, "it is precisely the function of qualified immunity ... to excuse reasonable mistakes in making the composite factual and legal judgments leading" to seizures. Sevigny v. Dicksey, 846 F.2d 953, 957 (4th Cir.1988).
 
 
 35
 In sending to trial the factual inquiry of whether Beck's reports were correct rather than asking whether the officers reasonably relied upon them, the majority's approach is in conflict with that of the Seventh Circuit in McKinney v. George, 726 F.2d 1183 (7th Cir.1984). That court held that "[i]f policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded." McKinney, 726 F.2d at 1187. The court noted that "it is unimportant whether McKinney really kept his neighbors up for two nights by screaming from his window" provided that the police had no reason to believe the complaint from his neighbors was untrue. McKinney, 726 F.2d at 1187. Plainly the police had no reason here to disbelieve what Beck had told them especially when their own observations confirmed her complaint.
 
 
 36
 A painstaking reconstruction before a jury of what the reality may have been will not further illuminate what these officers indisputably perceived--namely, that harrowing screams were coming from Gooden's apartment. Though the majority has the information it needs to resolve the question of qualified immunity, it sends the case to a jury. This, of course, defeats the purpose of qualified immunity because whatever rights these officers possessed will be "effectively lost" if this case "is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).
 
 II.
 
 37
 The majority's view of qualified immunity will produce a triable issue under section 1983 whenever the police commit an error. A search which fails to turn up incriminating evidence or a seizure of the wrong person must now be submitted to a jury so that the actual facts, not simply the facts as reasonably perceived by the officers, may be ascertained. This again is a misguided view of qualified immunity--it is as dangerous to conclude that a mistaken search or seizure presumptively poses a question for the jury under section 1983 as it is to believe that the finding of incriminating evidence or the arrest of an actual offender invariably defeats a motion to suppress.
 
 
 38
 The Supreme Court has never taken the view that a mistaken seizure presumptively abrogates qualified immunity. Rather, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present" and "those officials--like other officials who act in ways they reasonably believe to be lawful--should not be held personally liable." Anderson, 483 U.S. at 641, 107 S.Ct. at 3040. I see little room in the majority opinion, however, for any grant of summary judgment to law enforcement officials on the grounds of reasonable mistake. Here the officers' own impressions of the screams were corroborated by Beck's perceptions on the night in question and Beck's statements to the police that she had heard repeated screams and voices yelling from the apartment upstairs. The noises were frightening; the officers obviously feared for the safety of the woman in the apartment above and for the occupants of the complex. Unfortunately, in acting on the basis of this information and upon their own investigation, Officers Yeager, Pollack and Salter did make a mistake--Gooden is not mentally ill--and Gooden did suffer from the error. But the majority has yet to explain what it expected from these defendants.
 
 
 39
 Should they have washed their hands of the whole affair, leaving the screamer to injure herself or to disturb and harm the other residents? The situation placed the officers between the proverbial rock and hard place. If the officers acted and took Gooden in for evaluation and she proved not to be mentally ill, they faced possible suit and liability under section 1983, an eventuality that has come to pass. If they refused to act, however, and Gooden had seriously harmed herself or others, the officers might still have faced the prospect of suit under section 1983 or state tort law for failure to protect when they had plainly been placed on notice of dangerousness. See, e.g., Estate of Bailey v. County of York, 768 F.2d 503, 508-11 (3d Cir.1985) (state duty to protect not limited to persons in custody). It is true that a divided Supreme Court has subsequently held that an individual's due process rights are not violated by an official's failure to protect when the official had notice of danger, because the purpose of the Fourteenth Amendment "was to protect the people from the State, not to ensure that the State protected them from each other." DeShaney v. Winnebago County DSS, 489 U.S. 189, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). Surely, however, these officers are not to be charged with forecasting the DeShaney decision. The uncertainty in the law at the time of this incident would of course be asserted as a qualified immunity defense. Nonetheless, the officers can hardly be faulted for doubting the outcome of any legal action that might be brought against them for failure to defuse a dangerous situation for which they had twice been called to the scene and as to which they had twice been placed on notice. In addition, I find all too facile the suggestion that the officers should have walked away from the situation because Gooden evidenced no injuries at the time they were with her. Maj.Op. at 1360 and n. 6. If the officers had refused to act until they saw blood, bruises and splintered furniture, it might have been too late for Gooden or her neighbors.
 
 
 40
 I also find puzzling the majority's suggestion that the officers acted unreasonably in failing to gather more information. It is clear that the officers conducted a door-to-door canvass in an attempt to locate any possible alternative source of the screaming and found none. The majority is similarly unpersuasive in suggesting that the officers were wrong in failing to "make calls to verify [Gooden's] claim that she had not been screaming but instead had been on the phone with Marc Brogdon, her mother and Officer Carter throughout the evening." Maj.Op. at 1359. That course of action, however, may have invaded Gooden's privacy, may have embarrassed Gooden in the eyes of her family and friends, and would not even have conclusively established that the screams had not come from her apartment.
 
 
 41
 Finally, the majority appears to think that Cummings' testimony alone may render the officers' perceptions and conduct unreasonable. However, the majority is simply wrong in stating that the officers failed to verify the possibility that the screams came from the Dowlings' apartment. It is undisputed that Officers Yeager and Pollack went to the Dowlings' apartment, talked both to Mr. and Mrs. Dowling and learned that indeed the Dowlings had been arguing that night. Cummings states that, after comparing notes with him, Beck agreed that the screams came from the Dowlings'; Beck herself states that to this day she believes that the screams came from Gooden's apartment. Even the acceptance of Cummings' last-minute claims as true is not enough to explain away the police officers' firsthand perceptions of violent screams coming from Gooden's apartment. It is perfectly consistent that in such a large complex a couple in one apartment could be arguing while in another apartment a woman could be screaming. The belief that the two incidents were separate is detailed in the report by Sergeant Pollack in which he explained that the police had investigated another, separate disturbance: "The 'muffled' screams heard during the incident were later found to be originating from apartment # 312. The disturbance at that apartment was the result of a domestic fight at that location between a husband & wife.... This domestic disturbance does not appear to be related to the screams heard coming from the GOODEN apartment by PO's YEAGER and SALTER." Police report of 3/6/87, Incident No. 8710618, prepared by Sgt. W.J. Pollack, J.A. at 225.
 
 
 42
 Before rejecting the claim of qualified immunity in this case, the majority ought at least to suggest what an objectively reasonable course of official conduct might have been.* In the absence of any such suggestion, we are consigned to the conclusion that every mistake in search and seizure is presumptively a question for the jury. This approach is hardly satisfactory for situations rife with close discretionary judgment calls, and it does not comport with the leeway qualified immunity should afford to officers whose options on the night in question were never so clear as they now seem in courtroom daylight.
 
 III.
 
 43
 "If the law at [the time of an official's actions] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.
 
 
 44
 The majority compounds its misperception of qualified immunity by misapplying the Supreme Court's standard on the nature of "clearly established law." It concludes that the law was "clearly established" for purposes of qualified immunity because seizure of the mentally ill is directly analogous to a criminal arrest and must be supported by probable cause. Maj.Op. at 1362, 1363. However, a discussion of "clearly established" law at this level of generality proves nothing. Instead, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense" than the majority recognizes. Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id.
 
 
 45
 In Anderson, the Supreme Court held that the Court of Appeals had misapplied these principles because its discussion of qualified immunity "consisted of little more than an assertion that a general right Anderson was alleged to have violated--the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances--was clearly established" and because it erred by refusing "to consider the argument that it was not clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances." Anderson, 483 U.S. at 640-41, 107 S.Ct. at 3039-40 (emphasis in original).
 
 
 46
 The majority here commits the identical error: it states vaguely that the standard is one of "probable cause" and neglects to consider what constitutes probable cause for the purposes of seizing a person in order for that person to be given an emergency evaluation. The majority concedes that "a paucity of cases" exists to guide the conduct of officers in this latter situation. Maj.Op. at 1361. The one Maryland case cited by the majority held that involuntary commitment procedures adopted by the Baltimore City Police Department were overly vague and that "such confinements [to a mental hospital may] occur only where there has been some demonstration of overtly dangerous behavior." Gross v. Pomerleau, 465 F.Supp. 1167, 1173-74 (D.Md.1979). This statement--the only guidance the Gross court gives as to what is necessary for commitment--could not have been much help to Officers Yeager, Salter, and Pollack because it furnishes no particulars as to "dangerous behavior." None of the cases from outside the jurisdiction cited by the majority give clear guidance as to whether probable cause to detain Gooden for an emergency evaluation could be found in the circumstances of this case. See In Re Barnard, 455 F.2d 1370 (D.C.Cir.1971); McKinney v. George, 726 F.2d 1183 (7th Cir.1984); and Harris v. Pirch, 677 F.2d 681 (8th Cir.1982).
 
 
 47
 The meaning of clearly established law can best be understood by contrasting the law governing searches for evidence of a crime with the law governing seizures for psychological evaluations. In the former area, the Supreme Court has spoken in detail to the constituent elements of probable cause. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). By contrast, the area of detention for one's own safety or that of others is uncharted terrain, and lay police officers can hardly be expected to make the psychological evaluations that the majority will now require of them. Law enforcement personnel will search the majority's decision in vain for guidance on the concept of dangerousness. While it seems clear that no police officer can seize any citizen without foundation, the majority's decision creates a difficult zone where dangerousness to one's self or others may be debatable, where monetary liability will now be imposed for protective measures undertaken by policemen, and where judicial guidance is next to naught.
 
 
 48
 It is, in fact, easier to argue these officers were wrong in what they did than to argue they violated any principle of clearly established law. At the heart of the qualified immunity defense is the requirement that law enforcement officers have fair notice of what is required of them before monetary damages are imposed. Concluding that an official loses immunity "because he gambled and lost on the resolution" of an open question of law departs from the principles of Harlow because "[s]uch hindsight-based reasoning on immunity issues is precisely what Harlow rejected." Mitchell, 472 U.S. at 535, 105 S.Ct. at 2820 (defendant entitled to qualified immunity "notwithstanding that his actions violated the Fourth Amendment" because the law was not clearly established). By proceeding simultaneously to strike new paths in Fourth Amendment law and to try these officers for Fourth Amendment violations, the majority denies them the due process that is afforded to all others.
 
 IV.
 
 49
 Nothing would be more unlawful than random police roundups of citizens for emergency psychiatric evaluations. As to the wrongfulness of that, there can be no legal doubt. Officers who act without foundation should be brought to trial and should pay damages because "[i]n situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." Harlow, 457 U.S. at 814, 102 S.Ct. at 2736. However, there is also "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.' " Harlow, 457 U.S. at 814, 102 S.Ct. at 2736. It is not always possible for police to see and understand exactly what is happening when they arrive upon a scene. Occasional mistakes are inevitable. Any occupation in which employees face substantial legal liability for the slightest misstep will suffer both in morale and in effectiveness.
 
 
 50
 Officers Yeager, Salter and Pollack responded to a call from a frightened apartment resident. For their trouble, they received a section 1983 suit. The case will now go to trial and the legal incentives, whatever the outcome, will have been substantially skewed in the direction of inaction. Next time, these officers--and thousands like them--may not respond as quickly or act as firmly for public protection. The public loss will be a diffuse one--one which cannot manifest itself in a section 1983 suit. But, in the future, a Denise Beck may call for help--for herself or for someone truly distraught--and no one will answer.
 
 
 
 [1]
 The officers technically appeal from a later order denying a motion to alter or amend judgment. The district court had treated the officers' motion to dismiss as a motion for summary judgment, and we have jurisdiction to review an order denying summary judgment on qualified immunity grounds under 28 U.S.C. Sec. 1291. Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). To the extent the officers may seek to challenge other aspects of the order going to the merits of other claims, we lack jurisdiction to address any such challenge
 
 
 [2]
 A U.S. Sprint long-distance bill shows a call from Gooden's number to Brogdon's in Michigan between exactly 10:00 to 10:55 on that evening. In affidavit testimony, Brogdon stated that Gooden at one point said "ow" into the phone, then explained that she had just burned herself with an iron. Brogdon also stated that he had heard the knock on the door and the police identifying themselves and saying they were responding to a noise complaint. J.A. at 64
 
 
 [3]
 Such a "seizure," including that which indisputably occurred here, obviously has the same degree of intrusiveness on one's freedom of movement as an "arrest," and in this critical respect is distinguished from the less intrusive "investigative stop" that may be justified by a mere "articulable suspicion." See Terry v. Ohio, 392 U.S. 1, 15-16, 88 S.Ct. 1868, 1876-77, 20 L.Ed.2d 889 (1968). The critical distinction between the degrees of suspicion or belief required to justify the one type of seizure as against the other, and the fact that "probable cause" is the unquestioned standard for the more intrusive, see, e.g., Gerstein v. Pugh, 420 U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1974), were obviously well-settled constitutional principles of which reasonable police officers would have known at the times here in issue. Put another way, no reasonable police officer could have thought that taking Gooden against her will for a psychiatric evaluation was more akin to a mere investigative Terry stop than to a complete seizure by "arrest" for a state's custodial purposes
 
 
 [4]
 In its ultimate ruling on the officer's and city's summary judgment motion based on qualified immunity, the Gross court stated that the seizure was unconstitutional because a police commissioner memorandum on emergency psychiatric admissions set forth an impermissibly vague definition of mental illness. The court denied the officer qualified immunity under the now-abandoned, pre-Harlow, subjective good faith standard because it found genuine issues of material fact as to whether, under the circumstances of the arrest, the officer had relied in good faith on the unconstitutional procedures. The court did, however, grant summary judgment to the city, finding that the record entitled them to good faith immunity. Id. at 1175. This grant of qualified immunity to the city of course preceded the Supreme Court's decision in Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (municipalities do not enjoy qualified immunity from Sec. 1983 liability)
 
 
 [5]
 Of added significance to the state-of-the-law inquiry is the fact that Maryland statutory law, of whose constraints a reasonable police officer in the state surely must be charged with knowledge, contemplates a "probable cause" standard for commitment for emergency psychiatric evaluation. See Md. Health-Gen. Code Ann. Secs. 10-623 (probable cause determination by court required for commitment on petition of lay person); 10-622(a), (b)(2) (peace officer "who personally has observed" the subject and has "reason to believe" in grounds for commitment, may petition therefor); 10-624(a) (duty of peace officer to "take" subject for evaluation when armed with "reasonable cause" petition)
 While state law does not define federal fourth amendment standards for seizures of the person by state actors, see Fisher, 690 F.2d at 1138 & n. 5 (arrest), where, as here, the two are the same, a reasonable police officer's necessary awareness of the contours of the state standards perforce embraces awareness of the federal standard. In this sense, the contours of the federal probable cause standard for this type of seizure must be considered well-settled so far as a reasonable officer in Maryland is concerned.
 
 
 [6]
 The dissent opines, at 1367, that "[t]he majority's view of qualified immunity will produce a triable issue under section 1983 whenever the police commit an error." We of course adopt no such view. Our holding--as any fair reading would demonstrate--is only that where the reasonableness of police error is in genuine issue, summary judgment is inappropriate
 In contrast, the dissent apparently would always accept police officers' versions of what they perceived that caused them to err, even where, as here, their version has been put in genuine factual issue. This is reflected most dramatically in the dissent's statement, at 1366, that "these officers indisputably perceived ... that harrowing screams were coming from Gooden's apartment." The only thing undisputed on the summary judgment record about the source of any "harrowing screams" on which these officers acted is that one person had told the officers that they came from Gooden's apartment and that from that point on the officers accepted that account and acted on it. The accuracy of that perception and the reasonableness of the officers' continued acceptance of it (the dispositive issue here) is precisely what is put in genuine factual issue by the opposing accounts later given the officers by Gooden herself, and by Cummings.
 What may start out as a reasonable mistake in perception may become unreasonable as events of this kind unfold. And it is reasonableness in the end that counts.
 In this connection, it is critical to keep in mind that the drastic mistake concededly made here was not one made in a rush of life-threatening events, see Sevigny, 846 F.2d at 957 & n. 6 (exigency may, but did not in instant case, excuse mistake in perceiving probable cause), but was one formed over an extended period of time and under no pressure to act quickly in order to protect either the officers or others from physical harm or to prevent escape. Id. The only threats to anyone according to the officers' own version were (1) to Ms. Beck's peace of mind, and (2) to Gooden herself--a threat that turned out to exist only in the police officers' bizarre medical theory of a split personality disorder to explain the otherwise inexplicable presence of a single, apparently unruffled female at the presumed source of the "harrowing screams." Surely the watchword of reasonableness in this situation was extreme caution and care for citizens' rights rather than precipitate action in discharge of dangerous duty. Whether sufficient care and caution was exercised in getting the critical facts is precisely the genuine issue of material fact that stubbornly remains.
 
 
 *
 It is possible, of course, that the police might have arrested Gooden for breach of the peace or disorderly conduct. However, any such arrest would have been just as intrusive and perhaps more punitive. And, indeed, the majority opinion is not premised on the belief that the police should have effected a different sort of seizure of Gooden but that the police had insufficient reason to believe that anything was amiss in Gooden's apartment