**Garth MAAG, Plaintiff–Appellee,**

v.

**Richard WESSLER; Mike Boyer; Michael Sukut; City of Glasgow, Montana; Valley County, Montana, Defendants–Appellants.**

No. 90–35453.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1991.

Decided Sept. 23, 1991.

Joseph M. Sullivan, Emmons & Sullivan, J. David Slovak and Mark F. Higgins, Ugrin, Alexander, Zadick & Slovak, Great Falls, Mont., for defendants-appellants.

Donald W. Molloy, Anderson & Molloy, Rodney T. Hartman, Herndon, Hartman, Sweeney & Halverson, Billings, Mont., for plaintiff-appellee.

Before J. WALLACE, Chief Judge, and O'SCANNLAIN and LEAVY, Circuit Judges.

PER CURIAM:

This is an action filed by Garth Maag of Glasgow, Montana, under 42 U.S.C. § 1983 against three police officers and the City of Glasgow and Valley County, Montana, for taking him into custody for a medical evaluation. The officers, Richard Wessler, Mike Boyer, and Michael Sukut, appeal the denial of their motion for summary judgment in which they asserted a defense of qualified immunity. We have jurisdiction under 28 U.S.C. § 1291. *Duran v. City of Douglas, Arizona,* 904 F.2d 1372, 1375 (9th Cir.1990); *Baker v. Racansky,* 887 F.2d 183, 185 (9th Cir.1989).

We reverse. We hold that the officers are immune because there was probable cause to take Maag into custody.

## FACTS

On the evening of July 9, 1987, Arnetta Braaten, who was Garth Maag's wife; Kay Jackson, who is Braaten's daughter; and Kay's sister-in-law, Marlene Jackson, asked for police assistance when they could not locate Maag. Maag, who had been suffering for several weeks from the effects of mixing toxic pesticides, was very weak, lacked motor coordination, had slurred speech, and was irrational at times. That evening, Maag had insisted on driving to Glasgow for supplies even though he knew the supply store had closed. When one of the women refused to let him drive, he began to walk the more than three miles into Glasgow. His wife became concerned that, in his condition, he would be killed or injured along the highway. The women called a friend of Maag's, Bert Osen, for assistance. They then searched for Maag, but could not locate him along the highway or in Glasgow. At that point, Kay Jackson requested help from the police. The police and the women then returned to Maag's farm, where Osen was waiting, to search for Maag.

Maag appeared at the farm shortly thereafter, having been driven to Glasgow and back by an acquaintance. Upon his return, Maag insisted on driving his pickup to the field to check his irrigation, despite Officer Boyer's request that he not drive in his condition. Osen was concerned enough to follow Maag to the field to see if he was all right.

When Maag returned, he appeared disoriented and lost his balance when entering the house. Then, uttering profanities, he struck one of the women in the face with a wet sock when she tried to help him remove his shoes. After this incident he went to the bathroom to take a bath.

Because of the women's continued concern about Maag's welfare, their requests that the police take Maag to the hospital, and the officers' verification of Maag's poor physical and mental condition, Deputy Wessler called a physician, Dr. Gordon Bell. Deputy Wessler informed Dr. Bell what the women had told him about Maag's condition, and what the officers themselves had observed. Dr. Bell advised the officers to bring Maag to the hospital.

When the officers informed Maag that Dr. Bell wanted to see him, Maag refused to discuss anything or to go voluntarily to the hospital. The officers handcuffed him, placed him in the police car, and took him to the hospital. At Arnetta Braaten's request, the officers also removed Maag's guns from the home and gave them to Kay Jackson and Osen for safekeeping.

At the hospital, Dr. Bell decided to keep Maag overnight for observation.[1] Dr. Bell reported that Maag was "distinctly uncooperative," "wasn't willing to speak to me at all," and "was not able to give [any] indication that he was able to carry out logical thinking." Bell Deposition, at 6–8. While at the hospital, Maag refused to use the bathroom facilities and defecated on himself. The next morning, Maag was released.

Thereafter, Maag filed this action, claiming his constitutional right to be free from unreasonable seizure under the fourth amendment had been violated.

## DISCUSSION

At the outset, we note that the source of Maag's constitutional right against unreasonable seizure is the fourth amendment. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Although confinement of the mentally ill

by state action generally is analyzed under the due process clause of the fourteenth amendment, *see O'Connor v. Donaldson*, 422 U.S. 563, 573–76, 95 S.Ct. 2486, 2492–94, 45 L.Ed.2d 396 (1975), we analyze here the distinct right to be free from an unreasonable governmental seizure of the person for whatever purpose. *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871.

We do not, however, determine the broad question of whether the seizure of Maag violated the fourth amendment's proscription against unreasonable seizures, as Maag would have it.[2] To do so would merely state Maag's right in the abstract, rather than his rights under the particular circumstances of this case as the Supreme Court has mandated. *See Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *see also Tribble v. Gardner*, 860 F.2d 321, 323–24 (9th Cir.1988), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

Although there are few decisions that discuss the fourth amendment standard in the context of seizure of the mentally ill, all have recognized the proposition that such a seizure is analogous to a criminal arrest and must therefore be supported by probable cause. *See, e.g., Gooden v. Howard County, Maryland*, 917 F.2d 1355, 1361 (4th Cir.1990); *McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir.1984); *Harris v. Pirch*, 677 F.2d 681, 686 (8th Cir.1982); *In re Barnard*, 455 F.2d 1370, 1373 (D.C.Cir.1971).

The officers claim they had clear authority to take Maag into custody pursuant to section 53–21–129 of the Montana Code Annotated, which states in pertinent part:

1. Medical tests showed that Maag had suffered a loss of sensation in his feet, especially his sense of position; that he could not close his eyes and stand up without falling forward; and that his gait was unsteady. Bell Deposition at 9. Dr. Bell especially noted that it would have been fairly easy for Maag to trip, fall, or lose his balance, and that there could be potential dangers if Maag operated a motor vehicle. *Id.* at 9–10. Dr. Bell was particularly concerned about

Maag's lack of ability to make sound judgments. *Id.* at 10.

2. Maag claims that the issue before us is "[w]hether ... the police without a warrant may enter a man's home at night, seize his person and property, wrap him in a bath robe, slippers and handcuffs [sic] and take him into custody, not because of the suspicion of criminal activity or danger, but rather because he appears 'sick.' " Appellee's Brief at 3.

*Emergency situation—petition—detention.*

(1) When an emergency situation exists, a peace officer may take any person who appears to be seriously mentally ill and as a result of serious mental illness to be a danger to others or to himself into custody only for a sufficient time to contact a professional person for emergency evaluation. If possible, a professional person should be called prior to taking the person into custody.

(2) If the professional person agrees that the person detained appears to be seriously mentally ill and that an emergency situation exists, then the person may be detained and treated until the next regular business day.

It is clear from the depositions that at the time of Maag's seizure, each officer knew that he could take into protective custody any person who appeared to be a danger to himself or others.[3]

Thus we find that the officers had probable cause to take Maag into protective custody, based on the Montana statute, the information from family members and friends, the officers' own observations, and Dr. Bell's recommendation that Maag be brought to the hospital. There is nothing in the record to indicate that the officers acted with less than reasonable good faith. Therefore, they are immune. We also find the removal of Maag's guns at the family's request was a reasonable precaution to prevent potential harm.

■ As a final matter, we grant the appellants' request for attorney fees under 42 U.S.C. § 1988 in an amount to be determined by the district court on remand. For a defendant to be entitled to attorney fees in a civil rights action under section 1983, the plaintiff's action must be " 'frivolous, unreasonable, [and] without foundation.' " *Hughes v. Rowe,* 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980) (per curiam)

(quoting *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)). We hold that the current action meets that standard.

Garth Maag does not allege that the police used excessive force in detaining him, nor does he claim that he was subjected to abusive treatment while in police custody. Rather, he contends that the act of protective detention itself was unconstitutional. On the facts of this case, that contention is manifestly "frivolous, unreasonable, and without foundation." The defendant officers did not apprehend Maag on a groundless whim, and they did not act precipitously. They took Maag into custody only in order to transport him to a hospital for his own safety, and they assumed temporary possession of his firearms only in order to allay his wife's fears and only with her permission. The officers' actions were a measured response to a plea for help—a plea from Maag's own close friends and family. Only after discussing the situation with these benevolent witnesses, only after observing Maag's irrational and disoriented behavior themselves, and only after consulting with a physician who advised that Maag be brought to a hospital for evaluation, did the officers undertake to detain him.

To deny appellants an award of fees in the current context would therefore put a chill upon desirable police conduct. Garth Maag's dispute is with his friends and his former wife, not with the police. That dispute should not be played out at the taxpayers' expense and to the detriment of responsible law enforcement.

Our decision to award fees is not inconsistent with this court's recent decision in *Brooks v. Cook,* 938 F.2d 1048 (9th Cir. 1991). In *Brooks,* we held that a district court abused its discretion when it awarded attorney fees to the defendants in a section 1983 action given that this court had earlier overturned a directed verdict that had been

---

**3.** Maag states the officers could not cite specifically to section 53–21–129 and that therefore, they could not have known that they had authority to seize Maag. This argument lacks merit. An officer is not required to have "the kind of legal scholarship normally associated with law professors and academicians." *Ward v. County of San Diego,* 791 F.2d 1329, 1332 (9th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). It is sufficient that the officers knew generally of statutory or other authority to support the action they took.

entered against the plaintiff. Because the import of this court's earlier ruling had been to say, in effect, that it would not have been unreasonable for the jury to have found in favor of Brooks, it was clearly incongruous for the district court to say later that Brooks's action was frivolous under *Hughes*.

We have no such incongruity here. The district court's refusal to grant the defendants' motion for summary judgment on the legal ground of qualified immunity is not inconsistent with our ruling that Maag's action is frivolous on the merits.

REVERSED and REMANDED.

LEAVY, Circuit Judge, dissenting in part:

I dissent from the award of attorneys' fees. I cannot characterize this action as frivolous, unreasonable, and without foundation. The Supreme Court has explained that attorneys' fees are not normally awarded to prevailing defendants in § 1983 actions:

> it is important that a ... court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.... Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing a suit.

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978); *see also Hughes v. Rowe*, 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980) ("The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees.").

The district court denied the defendants' motion for summary judgment. As our precedent demonstrates, a district court's denial of a defendant's motion for summary judgment suggests that a plaintiff's claims are not without merit for purposes of attorneys' fees. *See Jensen v. Stangel*, 762 F.2d 815, 818 (9th Cir.1985); *see also Miller v. Los Angeles County Bd. of Educ.*, 827 F.2d 617, 620 (9th Cir.1987) ("A court should be particularly chary about awarding attorney's fees where the court is

unable to conclude that the action may be dismissed without proceeding to trial"); *Soderbeck v. Burnett County*, 752 F.2d 285, 295 (7th Cir.), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985) (If the plaintiff succeeded in making out a case strong enough to withstand a motion for directed verdict, the case was not frivolous).

Most recently, we have held that it is an abuse of discretion to award fees to defendants where we have reversed a district court on a directed verdict, because a section 1983 plaintiff "may have seen the reversal as an indication that he potentially had a case." *Brooks v. Cook*, 938 F.2d at 1055. Likewise, Maag no doubt viewed the district court's denial of summary judgment as an indication that he had a case. As an appellee he simply tried to persuade us to agree with the district court, which ruled in his favor.