Lois Barbara GROSS et al.

v.

Donald D. POMERLEAU et al.

Civ. No. Y–78–1279.

United States District Court,
D. Maryland.

Feb. 22, 1979.

herein was broad enough to provide indemnity for the negligence of the indemnitee's own employees.

Barry C. Steel, and Harry Fox, Baltimore, Md., for plaintiffs.

Millard S. Rubenstein, Asst. Atty. Gen., Baltimore, Md., for defendant Donald D. Pomerleau.

Robert C. Verderaime, Baltimore, Md., for defendants Bishop Robinson and Clarence Smith.

Judith K. Sykes, and H. Thomas Howell, Baltimore, Md., for defendants Marshal Belaga, M.D., Douglas Woodruff, M.D., and Addison W. Pope, M.D.

Francis B. Burch, Atty. Gen., and Diana G. Motz, Asst. Atty. Gen., Baltimore, Md., for defendant Honorable Edward F. Borgerding.

JOSEPH H. YOUNG, District Judge.

Plaintiff Lois Barbara Gross brings this action pursuant to 42 U.S.C. § 1983 and invokes jurisdiction in accordance with 28 U.S.C. §§ 1343(3) and (4), 1651, 2201 and 2202. In her complaint challenging the involuntary commitment procedures ádopted by the Baltimore City Police Department in admitting arrested individuals suspected of mental illness to the Psychiatric Screening and Evaluation Unit (the "Unit") at Baltimore City Hospital, she names seven individuals as defendants: Donald D. Pomerleau, Commissioner of the Baltimore City Police Department (the "Department"); Bishop Robinson, a Colonel in the Department; Patrolman Clarence Smith; Marshal Belaga, M.D., Director of the Unit; Douglas Woodruff, M.D. and Addison W. Pope, M.D., former Directors of the Unit; and Edward F. Borgerding, an Administrative Judge in the Maryland District Court for Baltimore City. Plaintiff seeks injunctive and declaratory relief as well as $50,000 in damages plus attorneys' fees and also class certification on behalf of herself and others similarly situated.

## I. STATEMENT OF FACTS

At approximately 6:40 a. m. on March 31, 1978, plaintiff was driving her car when defendant Smith stopped her and cited her for a violation of the Maryland Motor Vehicle Laws, namely, improper passing.[1] According to plaintiff's version of the story, Patrolman Smith, believing that she was in need of mental evaluation and treatment "did then and there forcibly, falsely and maliciously place plaintiff under arrest although there existed no probable cause that the plaintiff had committed any crime whatsoever or that she was mentally disordered, in need of hospitalization or dangerous to herself or others." Complaint at paragraph 7. After handcuffing plaintiff, Patrolman Smith transported her to the Central District Police Station in Baltimore City. She remained at the Station for several hours before being transported to the Unit for psychiatric screening and evaluation.

Plaintiff remained in the Unit for more than twenty-four hours and alleges that she was "not seen by anyone possessing the requisite expertise to conduct a psychiatric examination and evaluation." Complaint at paragraph 12. Plaintiff's release was ordered on April 1, 1978 after she was interviewed and examined by two psychiatrists who found no evidence of significant psychopathology. Plaintiff consequently filed this suit seeking to hold the defendants responsible for their actions pursuant to their various official and governmental capacities which contributed to plaintiff's alleged civil rights deprivation. Each of the defendants has now moved to dismiss the complaint, and, for the reasons stated within, these motions are granted for each of the defendants except as to Patrolman Clarence Smith.

## II. THE COMMITMENT PROCEDURE

Plaintiff was brought to the Unit pursuant to the procedures outlined in Police Commissioner's Memorandum 55–76 ("Memorandum") dated September 2, 1976. This involuntary commitment procedure was promulgated by the Police Department after review and approval by defendants

---

1. She was subsequently acquitted of these charges.

Borgerding[2] and Pope, as well as Alexander Yankelove, Associate Deputy, State's Attorney for Baltimore City. The policy behind the Memorandum was "to insure provision of medical attention for sick or injured prisoners including prisoners suspected of being mentally ill and who may harm themselves." Memorandum at 1. The express purpose of the procedures adopted was "to provide appropriate treatment for individuals who have been arrested and charged with minor offenses and are believed to be mentally ill, and therefore unsafe to be kept in a District cell block." *Id.* The Memorandum did not apply whenever an arrestee was charged with a serious offense and was not intended to conflict with the Emergency Admissions provisions of Article 59, section 22 of the Maryland Annotated Code.[3]

The Memorandum required that whenever a police officer "makes an on view arrest for minor offenses such as disorderly conduct or malicious destruction and believes the arrestee to be mentally ill," the arresting officer must prepare a Miscellaneous Incident Report describing the circumstances of the arrest and the behavior which led him to suspect mental illness, the arrest number and charge, as well as other information indicating whether the arrestee's behavior permitted processing. The Miscellaneous Incident Report had to be approved by a Sergeant or higher authority, and once all of the required paperwork was completed, the arrestee could be sent to "D" Building of City Hospital, together with the Miscellaneous Incident Report, for evaluation.

The Memorandum explains the procedures to be followed by the desk sergeant who must review the arrest report. All such reports are to be forwarded to the Assistant State's Attorney's Office for review. Once a prisoner arrives at "D" Building, personnel there must process the individual within twenty-four hours. Should the State proceed to prosecute, the prisoner is returned to the custody of the Baltimore Police Department, accompanied by a medical report from the Unit. The arrestee will then attend an initial hearing before a Court Commissioner.

Plaintiff claims that Patrolman Smith lacked the requisite probable cause to make the initial arrest and to order her commitment to the Unit. In an affidavit filed with the Court, Smith indicates that he stopped plaintiff at the time in question because she was speeding and driving to the left of the center of the road. Before he could question plaintiff, she began asking him why he stopped her and indicated that she was sick, would be late to work, and would miss her train. Plaintiff apparently continued in this fashion, yelling and waiving her arms. According to Patrolman Smith, plaintiff "yelling cries of family problems, not directly related to the incident at hand, caused affiant to stop writing and observe her through his rear view mirror. Plaintiff's yells were not of an abusive nature, but were rather combative with respect to losses which she would suffer as a result of his stopping her. Signs of depression were displayed, to the extent that it seemed plaintiff had just lost everything that she had ever owned. The acts were similar to those which affiant had observed in past experiences, and learned of through training regarding characteristics of persons having suicidal tendencies." Smith Affidavit at ¶ 14. In conclusion, defendant Smith states that he harbored no ill will or malice toward plaintiff and acted entirely in conformance with the Memorandum and what he thought were her best interests. At issue, then, is whether plaintiff's behavior at the time of the arrest was sufficient to justify a finding of probable cause for her eventual commitment to the Unit. To answer this question, the Court must review the standards contained in both the Memorandum and the Maryland Code's Emergency Admissions procedures.

---

**2.** Although not initially named as a defendant, Judge Borgerding was subsequently included by plaintiff's motion to amend her original complaint.

**3.** For an explanation of the civil involuntary commitment procedures in light of due process requirements, *see* Solomon, *Involuntary Commitment and Due Process: The New Maryland Regulations,* 3 Md.L.Forum 115 (1973).

### III. CONSTITUTIONALITY OF THE STANDARDS EMPLOYED

The Memorandum was obviously intended as a good faith attempt on the part of the Baltimore City Police Department to devise a practical means by which police officers in the street could deal with the sensitive matter of arrested individuals who were also suspected of being mentally ill. A notable difference from the state's Emergency Admissions procedures, however, is that the Memorandum treats *arrested* persons as opposed to the procedures for civil commitment found in article 59, section 22. The two procedures, however, were not intended to be in conflict, and presumably, the Police Department took its cue from the state legislation. Although this intent is by no means clear in terms of the record in this case, common sense suggests that both procedures were intended to deal with the same type of individual, *i. e.*, the mentally disturbed person, although in different contexts (civil vs. criminal).

■ Nevertheless, by consulting with an administrative judge, a member of the Baltimore City State's Attorney's Office, and the Director of the Unit, the Police Department attempted in good faith to promulgate a workable means which would accommodate all of the various competing interests at stake—legal, prosecutorial, medical, and the welfare of the individual arrested and temporarily committed. Having endeavored to formulate its procedures in the sunlight, the Police Department can hardly be charged with the "reckless disregard for . . . constitutional rights" as plaintiff alleges in her complaint. Complaint at paragraphs 8 and 10.

Nevertheless, the Court cannot overlook the glaring deficiencies in the procedures outlined therein. For example, the Memorandum fails to specify any criteria for assessing the symptoms of mental illness, many of which are inconclusive and subject to considerable ambiguity and misunderstanding. *See, e. g.*, Roth, Daley, & Herner, *Into the Abyss: Psychiatric Reliability and Emergency Commitment Statutes*, 13 Santa Clara L.Rev. 400, 404 (1973) ("Unreliable results in the application of psychiatric theory necessarily follow from the conceptual ambiguity of much of the most basic diagnostic terminology.") Maryland's Emergency Admissions procedure attempts to lay down at least a basic outline as to what is meant by "mental disorder":

> "Mental disorder" means the behavioral and other symptoms which to lay petitioner initiating the emergency admission process indicate a clear disturbance in the mental functioning of another person, and to a physician conducting an examination indicate one or more of the mental disorders described in the "Diagnostic and Statistical Manual-Mental Disorders" published periodically by the American Psychiatric Association. The term shall not include mental retardation.

Md.Ann.Code, art. 59, § 22(a)(4). The following subsection indicates that the initial commitment may be permitted without any judicial hearing so long as the subject demonstrates "clear and imminent danger of causing grave and immediate personal injury to himself or others." *Id.* at § 22(b). The remainder of the statute elaborates upon other aspects of emergency admissions depending on who files the petition, custody and transportation of an emergency admittee, examination, certification or release, and notice to certain persons. The Police Department's Memorandum fails to incorporate similar provisions, and it is unclear the extent to which the Memorandum was to incorporate by reference the provisions of article 59, section 22. For these reasons, the Memorandum must be held to be an unconstitutional procedure.

■ In *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), Chief Justice Burger noted that:

> There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law.

*Id.* at 580, 95 S.Ct. at 2496 (Burger, C. J., concurring). While the state or city pursuant to its legitimate police power interests

may be justified in providing means whereby emergency commitments shall be effectuated, this legitimate police power interest must be accompanied by the proper criteria. Commitment to an Evaluation Unit, even for a day, involves a loss of liberty, privacy, free association and could well have the effect of creating a stigma against the person confined. For these reasons, a minimum requirement has been that such confinements occur only where there has been some demonstration of overtly dangerous behavior. *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala.1974); *Finken v. Roop*, 234 Pa.Super. 155, 339 A.2d 764 (1975), *cert. denied*, 424 U.S. 960, 96 S.Ct. 1452, 47 L.Ed.2d 728 (1976).

The city police department attempting to deal effectively with emergency commitments faces an almost insurmountable problem. Essentially clinical decisions must be made initially by police officers with very little or no training in psychology or psychiatry, and the results of a mistake could be costly for the individual. These costs are not reduced merely because the person may already have been subject to a valid arrest: the additional decision that he should spend his incarceration, however brief, in a psychiatric unit rather than a lockup in effect subjects him to a more substantial deprivation of liberty. Referring to the problems attendant upon a civil commitment, the court in *Stamus v. Leonhardt*, 414 F.Supp. 439, 449 (S.D.Iowa 1976), observed that "the legal and social consequences of commitment constitute a stigma of mental illness which can be as debilitating as that of a criminal conviction." *See also In re Ballay*, 157 U.S.App.D.C. 59, 482 F.2d 648, 668–69 (1973); *Lynch v. Baxley, supra*, 386 F.Supp. at 393. Presumably, this stigmatization is possible even in situations where the commitment is brief.

Because the deprivation is greater, constitutional due process requirements mandate that proper procedures and criteria be applied whenever such a decision is made. The problem with the Memorandum lies in its application of a medical concept, "mental illness," as a legal standard on which this additional loss of liberty and possible stigmatization can be based. *See generally* Developments in the Law, *Civil Commitment of the Mentally Ill*, 87 Harv.L. Rev. 1190, 1254 (1974).[4] Efforts should be made to include such standards in the procedures employed, and those individual policemen actually responsible for their application should receive thorough instruction from properly trained medical personnel as to the symptoms of mental disorder and dangerousness which should warrant temporary emergency commitment of an arrestee.[5] More thorough instruction in these matters will help reduce the area of discre-

---

**4.** One of the problems with conditioning emergency commitment of an arrestee on a suspicion of "mental illness" is that the medical concept alone does not serve to distinguish the committable from the noncommittable:

> This assumption has been challenged by mental health professionals and legal commentators who emphasize the inherent subjectivity of psychiatric diagnosis. Whether they can challenge the very concept of mental disease or simply the ability of psychiatry to provide objectively verifiable identifications of mental disorders, critics argue that mental illness is simply a label placed on behavior which, although often not criminal, is annoying, burdensome, or frightening.

87 Harv.L.Rev. at 1254–55 (footnotes omitted).

**5.** The problem has been one of providing sufficient content to the phrase "mental illness":

> [S]tatutes can reasonably authorize the involuntary commitment of the mentally ill if the term is given a satisfactory legal meaning. Legislatures might employ mental illness as a legal term of art in commitment statutes in much the same manner as insanity is used as a legal concept when it is asserted as a defense to a criminal prosecution. However, statutory language must impart sufficient legal meaning to the term "mental illness" to withstand claims that the laws are unconstitutionally vague.
>
> *    *    *    *    *    *
>
> Recent statutes which employ terms such as "mental illness" or "mental disorder," but which particularize the class against which the laws may be invoked by delineating the type, extent, and immediacy of the harm required as well as the form of extrinsic evidence necessary for involuntary commitment, would appear to comply with the vagueness doctrine's requirement of objective standards.

87 Harv.L.Rev. at 1256, 1258 (footnotes omitted).

tion which exists with regard to the initial determination. The absence of standards restricting police discretion in complying with the Memorandum renders it overly vague and violative of constitutional due process standards. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Merely instructing an officer that he may send an arrestee for psychiatric screening and evaluation upon suspicion that he is "mentally ill" is too vague a standard to satisfy due process requirements and to justify the additional deprivation. Assuming the presence of proper standards, police officers who then apply them on the streets will be protected from civil liability for mistakes as long as they can show that they acted in good faith. See the discussion *infra* on immunity.

## IV. § 1983 LIABILITY AND GOOD FAITH IMMUNITY

Given the facts as plaintiff has related them, there is no basis for concluding that defendants Pomerleau, Robinson, Borgerding and the medical defendants [6] were motivated by malice or acted out of a reckless disregard for plaintiff's constitutional rights.

In *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality could be liable under § 1983 where a constitutional violation was the result of official policy:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

436 U.S. at 694, 98 S.Ct. at 2038. *See also Leite v. City of Providence*, 463 F.Supp. 585 (D.C.R.I.1978). While *Monell* makes it abundantly clear that municipal liability cannot be premised solely upon a *respondeat superior* theory, 436 U.S. at 691–95, 98 S.Ct. 2018, the imposition of liability upon a municipal government or its governmental units for the execution of certain official policies substantially expands the scope of § 1983 liability. A remaining issue, then, is whether the expansion of liability under *Monell* is in any way qualified by the presence of municipal immunity.

*Monell* refrained from commenting on the scope of any municipal immunity except to say that "municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 'be drained of meaning,' *Scheuer v. Rhodes*, 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)." 436 U.S. at 701, 98 S.Ct. at 2041. In the present case, injunctive and declaratory relief would be of no avail since, according to Dr. Belaga, the Memorandum is no longer being followed by his staff at the Unit.[7] Section 1983 actions seeking injunctive and/or declaratory relief have been declared moot when the practices, procedures, or regulations challenged were no longer in use. *See, e. g., Tawwab v. Metz*, 554 F.2d 22 (2d Cir. 1977); *Bradley v. Judges of Superior Court*, 531 F.2d 413 (9th Cir. 1976); *Shimabuku v. Britton*, 503 F.2d 38 (10th Cir. 1974); *Locke v. Board of Public Instruction*, 499 F.2d 359 (5th Cir. 1974); *Wilkinson v. Skinner*, 462 F.2d 670 (2d Cir. 1972); *Uzzell v. Friday*, 401 F.Supp. 775 (M.D.N.C.1975), *aff'd in pertinent part*, 547 F.2d 801 (4th Cir. 1977); *Rappaport v. Little League Baseball, Inc.*, 65 F.R.D. 545 (D.Del.1975). Since the present action

---

**6.** Affidavits submitted by Doctors Pope, Woodruff, and Belaga indicated that there was no personal involvement by any of them in plaintiff's case. Dr. Pope was not personally present or serving as the Unit's director on the date of the incident. Dr. Woodruff also stated that he was not the director at the time of the occurrence, and Dr. Belaga did not assume his duties as director until July 5, 1978, several months after the incident.

**7.** In his affidavit, Dr. Belaga said that the Unit had been abandoned, and his staff no longer accepted arrested persons pursuant to the Memorandum's procedures as of September 11, 1978.

seeks monetary relief, however, the case cannot be declared moot, and the scope of liability turns on whether the municipal and other defendants can successfully assert a good faith immunity defense.

The standard for good faith immunity in § 1983 actions was recently addressed by the Supreme Court in *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, *reh. denied,* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975). In *O'Connor,* the Court held that a State Mental Hospital's Superintendent could be held personally liable for monetary damages only if he "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [the patient], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [the patient]." 422 U.S. at 577, 95 S.Ct. at 2494, *citing Wood v. Strickland,* 420 U.S. at 322, 95 S.Ct. 992. An official has "no duty to anticipate unforeseeable constitutional developments," 422 U.S. at 577, 95 S.Ct. at 2495, and good faith reliance on a policy which later is held unconstitutional cannot lead to liability for monetary damages where the officials and individuals responsible for devising and implementing that policy did so without malice.

In *Wood v. Strickland, supra,* the Court elaborated a good faith immunity test to be applied to the conduct of school board members:

A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the stu-

dent's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. 420 U.S. at 322, 95 S.Ct. at 1001. Mr. Justice Powell, in a separate opinion, phrased the standard for qualified immunity of a government official as "whether in light of the discretion and responsibilities of his office, and under all of the circumstances as they appear at the time, the officer acted reasonably and in good faith." 420 U.S. at 330, 95 S.Ct. at 1005 (Powell, J., concurring in part and dissenting in part). Aside from plaintiff's broad allegations, there is nothing in the record to indicate that the municipal and medical defendants, or the court official, acted in disregard of plaintiff's constitutional rights. While each of them was involved in drafting, implementing, recommending or applying the policies in the Memorandum, there is nothing in the record which links them directly with plaintiff's initial arrest and ultimate commitment. Although *Monell, supra,* would apparently allow § 1983 liability for an unconstitutional policy such as the Memorandum, it does not abrogate the good faith immunity defense which these defendants may successfully invoke.[8]

In light of plaintiff's allegations and the statements included in an affidavit submitted in response to the Court's request that she particularly address the issue of actual malice present in the initial arrest and commitment determination, the Court cannot determine as a matter of law that defendant Smith qualifies for a good faith immunity defense. As the arresting officer, he must demonstrate that he acted upon a good faith belief that plaintiff had committed a traffic violation and needed psychiatric evaluation. In the event that he was acting in "reasonable good faith

---

8. Insofar as the medical defendants are concerned, they can invoke immunity for their activities at the Unit as they had no reason to believe that the Memorandum's commitment procedures in any way deprived plaintiff of her constitutional rights. *Sebastian v. United States,* 531 F.2d 900 (8th Cir.), *cert. denied,* 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976).

This immunity would extend to both the people conducting the evaluation and the Unit's administrative personnel. There is no indication in the record that any of these defendants behaved arbitrarily, recklessly, or maliciously so as to deprive plaintiff of her constitutional rights.

**1176**

reliance on . . . standard operating procedure," *Skinner v. Spellman,* 480 F.2d 539, 540 (4th Cir. 1973), then he should be entitled to immunity, despite the unconstitutionality of the procedure which he was following. *Norton v. Turner,* 427 F.Supp. 138 (E.D.Va.1977), *rev'd on other grounds,* 581 F.2d 390 (4th Cir. 1975) (officer can successfully assert qualified immunity if he acted in good faith belief that his conduct was lawful and that his belief was reasonable). *See also Hill v. Rowland,* 474 F.2d 1374, 1377 (4th Cir. 1973); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). In light of the presence of issues of material fact relating to the circumstances of plaintiff's arrest and commitment, defendant Smith's motion for summary judgment must be denied. F.R.Civ.P. 56(e). Summary judgment having been granted for all other defendants, plaintiff's motion for class certification will be denied.

Accordingly, it is this 22nd day of February, 1979, by the United States District Court for the District of Maryland, ORDERED:

1. That the summary judgment motions of defendants Pomerleau, Robinson, Belaga, Woodruff, Pope, and Borgerding be, and the same are, hereby, GRANTED;

2. That the summary judgment motion of defendant Smith be, and the same is, hereby, DENIED; and

3. That plaintiff's motion for class certification be, and the same is, hereby DENIED.