Theresa K. GOODEN, Plaintiff–Appellee,

v.

HOWARD COUNTY, MARYLAND, c/o Elizabeth Bobo, County Executive, Nancy Yeager, individually and in her capacity as a police officer of the Howard County Police Department; Frank N. Salter, individually and in his capacity as a police officer of the Howard County Police Department; William J. Pollack, individually and in his capacity as a police officer of the Howard County Police Department, Defendants–Appellants,

and

Frederick W. Chaney, in his capacity as Chief of Police of the Howard County Police Department, Unknown and Unidentified Police Officers of the Howard County Police Department, hereinafter referred to as John Doe I, John Doe II, John Doe III, John Doe IV, and John Doe V, who were present at and involved in the incidents complained of herein, individually and in their capacity as Police Officers of the Howard County Police Department, Defendants.

No. 89–2470.

United States Court of Appeals, Fourth Circuit.

Argued April 9, 1991.

Decided Jan. 23, 1992.

961

Marna Lynn McLendon, Senior Asst. County Sol., Ellicott City, Md., argued (Barbara M. Cook, Howard County Sol., on brief), for defendants-appellants.

Cheryl Lynn Ziegler, Morgan, Lewis & Bockius, Washington, D.C., argued (William L. Gardner, Howard T. Weir, Morgan, Lewis & Bockius, Roderick V.O. Boggs, Washington Lawyers' Committee for Civil Rights Under Law, on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, WILKINSON, WILKINS, and NIEMEYER, Circuit Judges, and BUTZNER, Senior Circuit Judge, sitting in banc.

## OPINION

WILKINSON, Circuit Judge:

This case presents important issues pertaining to the defense of qualified immunity from suit under 42 U.S.C. § 1983. The factual circumstances are unusual, even bizarre, but the issues they raise as to qualified immunity occur all the time. It was to clarify these issues and to underscore the reasonable latitude accorded law enforcement officers in the performance of their duties that the court granted an en banc hearing in this case.

### I.

On the morning of February 21, 1987, Officer Nancy Yeager responded to a call from 11329 Little Patuxet Parkway, Columbia, Maryland. Upon arriving at the apartment complex, Officer Yeager, who was joined by Sergeant William Pollack, contacted the complainant, Denise Beck, who reported that she had heard screaming and yelling coming from the apartment directly overhead. The two police officers then contacted Theresa Gooden who lived in the apartment directly above Ms. Beck's. After Officer Yeager explained to Ms. Gooden the purpose of their investigation, Ms. Gooden responded that she had been asleep, that no one was in the apartment with her and that she had no knowledge of the noise. After some brief questioning, the officers left.

On Monday, March 2, 1987, at 10:47 p.m., Officer Yeager, accompanied by Officer Frank Salter, responded to another call from Beck, this time for a woman screaming. Immediately after entering the first level of the apartment building, they heard what Officer Yeager described to be a "long, loud blood-chilling scream" that convinced her that someone was being hurt. Both officers believed the source of that scream to be Gooden's apartment and ran up to the third level hallway. Standing outside of Gooden's apartment, the officers heard yet another scream coming from within. In response to Officer Yeager's knock, Ms. Gooden opened the door. After first denying that any noise or scream came from her apartment, Ms. Gooden admitted that she had "yelped" once because she had burned herself on an iron.

The ensuing events are a matter of dispute. According to Officer Yeager, she asked to see the iron. Yeager noted that there were no clothes on the ironing board and that the iron was cold to the touch.

Officer Yeager then asked to see the burn. Ms. Gooden refused to let her look. During the visit, the officers looked around the apartment and out on the balcony to make sure no one else was there. Still convinced that the screams she had heard came from Ms. Gooden who was either in danger of harming herself or of being harmed, Officer Yeager concluded that Ms. Gooden was not being candid with Officer Salter or her. Officer Salter also described Ms. Gooden as "very vague" and "evasive towards any questions."

Ms. Gooden's version of events is not surprisingly quite different. She was on the phone with a friend, she said, when the police officers knocked. She maintains that she answered all of the officers' questions, explained that she had burned herself and showed them the ironing board. According to Ms. Gooden, the iron was still plugged in and there was a blouse and a wet spot on the ironing board, which she invited Yeager to feel. Ms. Gooden asserts that she "attempted to show defendant Yeager the red mark on [her] arm, but she insisted on seeing a burn." Gooden states that she told the officers that they were harassing her and asked them to leave.

After leaving Ms. Gooden's apartment, the two officers returned to Ms. Beck's apartment. Ms. Beck further described the loud commotion and stumping and movement above her, a disturbance sometimes so great that the chandelier in her dining room would shake.

While standing in Ms. Beck's apartment, Officer Yeager again began to hear noises coming from the upstairs apartment, including loud thuds and very loud screaming. Officer Salter also heard the noises and commotion. Officer Yeager heard a male voice and a female voice yelling, but never heard the voices simultaneously. In addition, Officer Yeager saw the chandelier shake. Based on these noises, Officer Yeager suspected that Ms. Gooden might be a multiple personality and producing both voices herself.

Sergeant Pollack now arrived on the scene, and the three officers returned to Ms. Gooden's apartment after all residents

in the building were contacted and no other source of the disturbance was found. When Ms. Gooden answered the door this time, she appeared to have been crying. Officer Yeager informed Ms. Gooden that they had heard more screams. Ms. Gooden replied: "Why are you doing this to me?" Officer Yeager reports that she attempted to reassure Ms. Gooden that they were concerned for her safety and to discover why she was in such an emotional state, suggesting to her possible reasons.

Ms. Gooden was unresponsive, according to Officer Yeager, and looked nervous and uncomfortable. Similarly, Sergeant Pollack later reported: "[i]t was my opinion that she was responding strangely to our inquiries, and refused to give any explanation for her demeanor or acknowledged [sic] the fact that screams came from her apartment." Ms. Gooden maintains that she told the officers not only that she had been on the phone with her mother and a friend since they had left her apartment approximately one-half hour before but that she had called their department while they were gone to inquire about lodging a formal complaint. The officers, however, state that they did not know about Gooden's complaint.

With Ms. Gooden's permission, the officers checked her apartment. All three officers noted that while they were with Ms. Gooden no screams were heard.

The three officers left Ms. Gooden's apartment and conferred in the hallway. Sergeant Pollack asked Officer Yeager and Officer Salter whether they felt there was enough to warrant an emergency evaluation. In her affidavit, Officer Yeager explained that:

Both Officer Salter and myself immediately felt that we had a duty to do something with Ms. Gooden as we feared for her safety and felt that she was mentally disordered and a potential threat to herself. I was convinced that the screaming and noise that I had heard had come from her apartment, and, having ruled out the presence of anyone else in the apartment, the violent nature of the noise indicated to me that she was at-

tempting to harm herself by throwing herself against walls and/or floor.

Yeager stated that, in nine years of law enforcement experience, "I have never seen a situation so bizarre." The officers were convinced, as Officer Yeager explained, that Gooden "was a risk to herself and that a psychiatric evaluation was absolutely necessary." Officer Salter detained Ms. Gooden, took her to the Howard County General Hospital and submitted a petition for evaluation.

It is disputed whether the officers had contact that evening with any apartment complex residents other than Ms. Beck claiming knowledge of the screaming. Patrick Cummings, a neighbor, asserts that he told one unidentified Howard County police officer that the commotion was coming from the Dowlings' apartment, which was located directly under Ms. Beck's. According to Cummings, when he entered Beck's apartment, he told the officers that they had the wrong person because it was the Dowlings not Ms. Gooden who were responsible for the disturbances. In addition, Cummings maintains that he and his wife conferred with Ms. Beck and that she then stated: "Oh my God, they took the wrong person." In her affidavit, however, Ms. Beck states: "I believed on both occasions and I continue to believe that the noise I heard and complained about was, in fact, coming from Theresa Gooden's apartment located directly above me."

Yeager and Pollack do not recall speaking with Cummings but they apparently did investigate a domestic argument in the ground floor apartment inhabited by the Dowlings. The couple admitted that they had been arguing but attempted to assure the officers that everything was fine. Officer Yeager took the information and later filed a report.

Officer Yeager returned to the police station where she called Ms. Gooden's mother in Michigan to explain what had happened, that the officers were concerned for Ms. Gooden's safety, and that she would be returned to her apartment if the physician did not admit her for further evaluation. Sergeant Pollack went to the hospital. There, he explained to Ms. Gooden that the actions taken by the police officers that evening were for her welfare and that the police would transport her back home if the doctors released her. Dr. Barton Hershfield, who examined Ms. Gooden, found no sign of mental illness and released her.

Theresa Gooden filed suit against Howard County, Maryland, its chief of police, and against officers Yeager, Salter, and Pollack, in their individual and official capacities. She sought damages under 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3) and under various state law theories. The defendants all filed motions to dismiss which the district court treated as motions for summary judgment. The district court granted the motion as to the chief of police and as to Howard County on several counts but denied defendant officers' claims that they were entitled to qualified immunity. The individual officers and the county appealed this interlocutory ruling pursuant to *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and a divided panel of this court upheld the district court's denial of immunity. *Gooden v. Howard County*, 917 F.2d 1355 (4th Cir. 1990). The court then granted rehearing en banc, and we now reverse the district court's judgment.

## II.

The basic principles of qualified immunity are well known and we see no reason to belabor them here. A test of the objective reasonableness of official action has been formulated with the express purpose of according police officers latitude in exercising what are inescapably discretionary functions replete with close judgment calls. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982) ("where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' ") (citation omitted). The immunity is to be applied with due respect for the perspective of

police officers on the scene and not with the greater leisure and acquired wisdom of judicial hindsight.

The officers claim that this case presents just the sort of situation to which qualified immunity must apply and that they were forced to choose between taking Gooden in for an evaluation and leaving her alone with all the attendant risk that she might have harmed another or seriously hurt herself. Gooden argues that the customary presumption favoring immunity cannot absolve the officers from liability for the detention and dignitary affront to which she was subjected. Three reasons are advanced for denying qualified immunity in this case: (1) the presence of disputed facts as to what actually transpired on the evening of March 2; (2) the fact that the ultimate judgment of the officers with respect to Ms. Gooden was a mistaken one; and (3) the allegation that the officers violated what were clearly established principles in the field of detention for psychiatric evaluations. We shall examine these arguments in turn as they bear upon the availability of the qualified immunity defense.

### A.

■ Gooden first suggests that this case must go to trial because there are genuine issues of material fact as to what actually did occur at the Patuxet Parkway apartment complex on the evening of March 2. The panel majority and the district court agreed, with the latter stating: "if there was ever a case that cried for a trial, this is it." According to this view, there were at least three different versions of what transpired that could only be reconciled by a jury: that of the officers, that of Gooden herself, and that of Cummings, and perhaps other bystanders. *See Gooden,* 917 F.2d at 1363–64. Not until these various versions were meticulously sorted out by an appropriate factfinder could the case be properly resolved.

■ We think this view misconceives the basic purpose of qualified immunity which is to spare individual officials the burdens and uncertainties of standing trial in those instances where their conduct

would strike an objective observer as falling within the range of reasonable judgment. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (qualified immunity necessary because "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."). The application of that general principle to this specific situation is apparent. In cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place. It will nearly always be the case that witnesses to a crime differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact. What matters is whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced. *See Sevigny v. Dicksey,* 846 F.2d 953, 956–57 (4th Cir.1988). However, "an arrest is not unlawful merely because the information on which it is based is wrong." *McKinney v. George,* 726 F.2d 1183, 1187 (7th Cir.1984). Instead, "in determining 'the information the ... officers possessed,' *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040, the court must determine what the police reasonably perceived the reality to be." *Gooden,* 917 F.2d at 1365 (Wilkinson, J., dissenting).

■ Though there is lively debate as to the actual origin of the screams on the evening of March 2, there is little dispute here about what the officers perceived. Certainly, it is possible that the acoustics of the building were such that the screams perceived by the officers to be coming from Gooden's apartment were actually emanating from some other source. We are aware of no evidence, however, that the officers' mistaken perception—if in fact it was mistaken—was unreasonable. In the

absence of a genuine dispute as to the reasonableness of the officers' perceptions, the issue of qualified immunity is ripe for summary judgment.

Here, the actions of the officers in taking Ms. Gooden into custody for an emergency psychiatric evaluation were reasonable, in light of the information they possessed. The officers acted on the basis of multiple complaints by Ms. Beck, an apartment resident whose veracity they had no reason to doubt. There is no question that Ms. Beck struck the officers as an ordinary citizen who had called them to the scene both because her peace of mind was disturbed by the violent nature of the screaming and because she feared that someone in the apartment was about to be hurt. The officers can hardly be faulted for attaching credence to such citizen complaints. As the Seventh Circuit has noted, the police cannot invariably be held under § 1983 as guarantors of every such report. Rather, "[i]f policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded." *McKinney*, 726 F.2d at 1187.

Moreover, the officers here did not just act on Ms. Beck's complaint. Indeed, they waited until the substance of that complaint had been confirmed no less than three times by their personal observations. On their first visit to the complex, the officers in fact took no action. However, on their second visit, they were greeted upon entering the building with a horrible scream that appeared to come from exactly where Ms. Beck said it had. A second scream appeared to emanate from Gooden's apartment when the officers were outside the door. While talking with Beck after their initial contact with Gooden, the officers heard yet a third scream from that same apartment accompanied by thumps which caused the chandelier in Beck's apartment to sway. Further, the officers investigated alternative sources for the noise but found no explanation other than the one that Ms. Beck's report and their own observations had appeared to confirm—namely, that the screams were originating from Gooden's apartment. The officers' actions, furthermore, were pursuant to state procedure which authorized them to petition for emergency evaluation of an individual when they had "reason to believe that the individual has a mental disorder and that there is clear and imminent danger of the individual's doing bodily harm to the individual or another." Md. Health–General Code Ann. § 10–622(a) (1990). Under these circumstances, the officers can hardly be faulted for taking action against what they reasonably perceived to be a genuine danger to the residents of the Columbia apartment complex or to Ms. Gooden herself.[1]

## B.

It is conceded in this case that the officers made a mistake. Ms. Gooden is not mentally ill and all concerned wish that she had not been detained in any fashion on the evening in question. The fact that a mistake was made, however, cannot be dispositive of the issue of qualified immunity in this lawsuit. The Supreme Court has "recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that

---

1. The dissenting opinion contends that a citizen's reports to officers that screams came from a particular apartment, and the officers' undisputed personal observations that the source of the screams was where the citizen indicated, do not constitute a reasonable basis for the award of summary judgment. To make a credibility contest out of this incident is to make a credibility contest out of limitless police-citizen encounters, because the dissent's view of the disutility of summary judgment has no apparent cut-off point. Despite a general nod or two in the direction of the difficulties of police work, the dissent never attempts to explain what meaningful limits the qualified immunity defense imposes upon its view that summary judgment should be sparingly granted to law-enforcement officials. Nor is there the slightest tally in the dissenting opinion of the substantial costs entailed for the entire enterprise of law enforcement in its view that the presumptive forum for the inevitable disputes that accompany police-citizen contacts is a trial.

probable cause is present" and "those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3040. If every mistaken seizure were to subject police officers to personal liability under § 1983, those same officers would come to realize that the safe and cautious course was always to take no action. The purposes of immunity are not served by a police force intent on escaping liability to the cumulative detriment of those duties which communities depend upon such officers to perform.

In this case, the costs of inaction may be readily appreciated. Had the officers left alone a woman from whom they had thrice heard blood-curdling screams and whose apparent condition had caused another citizen to twice call them to the scene, they may have been derelict in their duty. The course of caution in these circumstances may well have been to bring the individual in for some sort of emergency care or evaluation which might alleviate a potentially serious situation. Had the officers done nothing—and had Ms. Gooden hurt herself or someone on the premises—the consequences may have been irremediable. It is a misguided application of § 1983 to expose to liability those who by all objective indicia were only trying to help. It is further "all too facile [to suggest] that the officers should have walked away from the situation because Gooden evidenced no injuries at the time they were with her. If the officers had refused to act until they saw blood, bruises and splintered furniture, it might have been too late for Gooden or her neighbors." *Gooden*, 917 F.2d at 1367 (dissenting opinion).

What makes the denial of qualified immunity even more troubling is the fact that even inaction in this case might not have spared the officers from liability under the law. Indeed, the officers here faced the prospect of a lawsuit whichever way they turned. Taking Ms. Gooden to be evaluated has exposed these officers to section 1983 liability. Yet it was also an open question at the time whether a failure to protect someone whose distressed condition

had been pointedly revealed to the police would constitute a violation of due process. If the officers had failed to act and Gooden had injured herself or others, they would have faced the prospect of suit under section 1983 or state tort law for failure to safeguard someone as to whose unstable situation they had twice been placed on notice. *See Estate of Bailey v. County of York*, 768 F.2d 503, 508–11 (3rd Cir.1985) (where special relationship exists, agency owes duty of protection to persons not in custody); *Jensen v. Conrad*, 747 F.2d 185, 194–95 (4th Cir.1984). Lawsuits for such failures to protect were anything but an oddity. It is true that a federal district court had refused to find a due process violation by police officers who failed to take into custody a mentally ill man who subsequently shot himself, *Gilchrist v. Livonia*, 599 F.Supp. 260, 263 (E.D.Mich. 1984), but the officers could hardly be confident that similar results would obtain where evidence of seemingly desperate outcries had occurred within their very presence. Subsequently, of course, the law has been clarified: a divided Supreme Court has ruled that an individual's due process rights are not violated by an official's failure to protect him against private violence when the official had notice of danger. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 201–02, 109 S.Ct. 998, 1006–07, 103 L.Ed.2d 249 (1989). Had the officers here been sued for failure to protect, they assuredly would have asserted the prior uncertainty in the law as a qualified immunity defense. However, it is hard to fault these officers for refusing to rest upon the shifting sands of qualified immunity and instead acting prudently to diffuse a dangerous situation in a way that might even have been constitutionally compelled.

### C.

 Gooden further argues that the defendants did not act reasonably in light of clearly established law. She asserts that, by March 2, 1987, the law was clearly established that the Fourth Amendment prohibits the seizure of a person for psychi-

atric evaluation in the absence of probable cause of mental illness. We agree that the general right to be free from seizure unless probable cause exists was clearly established in the mental health seizure context. *See Harris v. Pirch*, 677 F.2d 681, 686 (8th Cir.1982); *In re Barnard*, 455 F.2d 1370, 1373 (D.C.Cir.1971); *Gross v. Pomerleau*, 465 F.Supp. 1167, 1171 (D. Maryland 1979); *Williams v. Meredith*, 407 A.2d 569, 574 (D.C.1979). Arguably, it was also clearly established in Maryland that a minimum requirement of the necessary probable cause was "some demonstration of overtly dangerous behavior." *Gross*, 465 F.Supp. at 1173.

However, "if the test of 'clearly established law' were to be applied at this level of generality," . . . . [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3039. Instead, for an official to lose his qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. *"Harlow's* 'clearly established' standard demands that a bright line be crossed." *Barts v. Joyner*, 865 F.2d 1187, 1194 (11th Cir.1989). "The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir. 1986). Of course, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted).

Here, the law was not clear and thus failed to put these officers on notice that their conduct was unlawful. We are aware of no cases that define "dangerousness" with the requisite particularity or explain what type or amount of evidence would be constitutionally sufficient to establish probable cause of a dangerous condition. None of the few cases evaluating detentions by police for the purpose of emergency evalu-

ations could possibly have given these defendants any clear indication that their conduct was unlawful because none of the circumstances really resembled the situation in which the officers found themselves in this case. *See Harris*, 677 F.2d at 689 (officer entitled to good faith immunity for detaining woman for emergency evaluation where officer knew of woman's recent hospitalization, woman was upset and became angry when questioned, and officer feared woman had taken overdose); *People v. Triplett*, 144 Cal.App.3d 283, 192 Cal.Rptr. 537, 539–41 (1983) (officer had probable cause to detain apparently intoxicated woman with watering eyes and slashed wrist). In fact, looking at the *Triplett* case, the officers might well have felt reassured that their actions were appropriate. *See, Triplett*, 192 Cal.Rptr. at 541 ("It is sufficient if the officer, as a lay person, can articulate behavioral symptoms of mental disorder, either temporary or prolonged. . . . [such] disorder might be exhibited if a person's thought processes, as evidenced by words or actions or emotional affect, are bizarre or inappropriate for the circumstances.").

Certainly the concept of "dangerousness" which calls on lay police to make a psychological judgment is far more elusive than the question of whether there is probable cause to believe someone has in fact committed a crime. The lack of clarity in the law governing seizures for psychological evaluations is striking when compared to the standards detailed in other Fourth Amendment contexts, where probable cause to suspect criminal misconduct has been painstakingly defined. *See, e.g., Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Of course, the law in no way permits random or baseless detention of citizens for psychological evaluations, but that was hardly the case here. Under the circumstances, the officers were not provi-

sioned with adequate legal guidance, and the protective measures taken by the police with regard to Ms. Gooden failed to violate a clearly established constitutional right.

### III.

■■■■ We hold then that the officers' conduct on the evening in question satisfies the test of objective reasonableness laid down by the Supreme Court. This being the case, immunity presumptively protects these officers against all claims arising from the operative facts surrounding the seizure. Gooden maintains, however, that the defendants are liable under § 1985(3) for conspiring to deprive her of equal protection as well as under § 1983 for the alleged Fourth Amendment violation.[2] Specifically, Gooden alleges that the officers demonstrated the racial animus necessary to a § 1985(3) claim by believing Beck, a white woman, and not her, a black woman, and by taking her for an emergency evaluation while merely admonishing the Dowlings—a white couple.

Whether the claims arising from the challenged seizure are framed in terms of § 1983 or § 1985(3) is not the dispositive question, however. Such claims seek in essence to challenge the same conduct—the decision to take protective measures with respect to Ms. Gooden on March 2. The fact that section 1985(3) incorporates an element of subjective animus is also not determinative. To say simply that plaintiffs' subjective claims can only be met by official denials of subjective animus is to vitiate the entire concept of qualified immunity as we have come to understand it. *See Martin v. D.C. Metropolitan Police Dept.*, 812 F.2d 1425, 1434 (D.C.Cir.1987). The Supreme Court has stressed emphatically that the test for qualified immunity is to remain an objective one. *See Harlow*, 457

U.S. at 818–19, 102 S.Ct. at 2738–39. We thus cannot permit a return to the discredited subjective view of immunity whenever challenges to police searches and seizures are artfully pled as violations of section 1985(3). Indeed, the protection afforded officials by an objective test would be illusory if the simple allegation of discriminatory animus sufficed to set it aside. "[I]n some instances, plaintiffs might allege facts demonstrating that defendants have acted lawfully, append a claim that they did so with an unconstitutional motive, and as a consequence usher defendants into discovery, and perhaps trial, with no hope of success on the merits." *Hobson v. Wilson*, 737 F.2d 1, 29 (D.C.Cir.1984). Clearly, "[t]he result would be precisely the burden *Harlow* sought to prevent." *Id.*

■■■■ It would often seem anomalous, as well as inimical to the purposes of immunity, to say that the same conduct might be objectively reasonable but subjectively unreasonable, just as it would be inimical to the protection of those constitutional rights safeguarded by the civil rights statutes to suggest that subjective good faith was sufficient to invoke immunity if the objective conduct could not be reasonably justified. Theoretically, of course, it may be possible for an official to act in an objectively reasonable way but with such subjective animus that he or she is immune from suit under § 1983 but is liable under § 1985(3). Such cases would be rare, however, because, in most instances where a § 1985(3) claim related to a search or seizure was stated, subjective animus would manifest itself in excessive force or in behavior so baseless that courts could not conceivably find the conduct objectively reasonable.

To avoid evisceration of the purposes of qualified immunity, courts have thus required that plaintiffs alleging unlawful intent in conspiracy claims under § 1985(3) or

**2.** 42 U.S.C. 1985(3) states in relevant part:

If two or more persons in any State or Territory conspire ..., for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in

furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

§ 1983 plead specific facts in a nonconclusory fashion to survive a motion to dismiss. *See Easter House v. Felder*, 852 F.2d 901, 919 (7th Cir.1988), *vacated on other grounds*, 861 F.2d 494 (1988); *Pueblo Neighborhood Health Centers v. Losavio*, 847 F.2d 642, 649–50 (10th Cir.1988); *Hobson*, 737 F.2d at 29. Here, plaintiff fails to satisfy that requirement. The § 1985(3) claim was essentially an afterthought with little more to support it than the respective racial identities of the individuals involved. The mere statement, however, that the officers in question and Ms. Beck were white and Ms. Gooden was black cannot suffice to overcome the fact that the officers acted upon the basis of a citizen's complaint, confirmed repeatedly by their own observations, that Ms. Gooden was in distress. Nor has Ms. Gooden presented any evidence of a conspiracy of two or more persons as required to state a claim under § 1985(3). *See Easter House*, 852 F.2d at 919 ("This circuit has recognized the danger of litigants' adducing unfounded conspiracy allegations in order to block summary judgment against weak claims."). Therefore, the § 1985(3) claim must be dismissed.[3] The state law claims are also dismissed, but without prejudice.

### IV.

For the foregoing reasons, the judgment of the district court is

REVERSED.

---

**PHILLIPS,** Circuit Judge, dissenting:

For the reasons expressed in the vacated panel majority opinion, 917 F.2d 1355 (4th Cir.1990), I dissent. The district judge correctly ruled that there were genuine issues of material fact which made summary judgment on the basis of qualified immunity inappropriate. In the district court's words, "... if there was ever a case that cried for a trial, this is it.... On the face of everything I've read and everything I've heard, this is what juries are for." That assessment was an eminently correct one made by an experienced and careful trial judge fully aware of the important purposes served by the qualified immunity defense and that those purposes are not fully realized when resolution of the defense is deferred to trial, but also conscientiously aware of the ultimately limiting principle in summary judgment doctrine that made trial necessary here. The resulting denial of summary judgment should be affirmed.

### I

I rely on the vacated panel majority opinion as demonstrating the particular material facts relevant to the qualified immunity defense that remain in genuine issue and for its discussion of the "settled law" issue. I add here some more general observations about the danger-exemplified in the majority opinion—that in an excess of zeal to protect police officers from the rigors and "chilling effect" of trial, courts may be tempted to skew summary judgment doctrine in favor of the officers when immuni-

---

**3.** We cannot accept Gooden's view that the § 1985(3) claim is beyond our purview. As we have noted, both the § 1983 claim and the § 1985(3) claim seek to challenge the same police conduct arising out of the same set of operative facts and circumstances. Whether the purposes of *Harlow* in discriminatory animus cases are expressed by means of a qualified immunity formulation or by a requirement of heightened pleading is not critical. In either case, courts have sought to achieve the same purpose, namely the effectuation of the aims of qualified immunity in claims which incorporate a subjective element.

The district court's denial of the officers' motions for summary judgment under § 1985(3) may thus readily be seen as tantamount to a denial of qualified immunity, and as such is reviewable upon appeal. *See Gometz v. Culwell*, 850 F.2d 461, 463 (8th Cir.1988) (denial of summary judgment based on qualified immunity held immediately appealable where issue presented was sufficiency of evidence to support conspiracy claim under § 1985(2)). Indeed, to hold the § 1985(3) claim unreviewable would be both to condemn official assertions of immunity to piecemeal appellate resolution and to undercut the mechanism for review established by *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In order to avoid such a piecemeal approach, a number of courts have disposed of closely related pendent issues in appeals such as this one. *See Hill v. Department of Air Force*, 884 F.2d 1318, 1320 (10th Cir.1989); *Foster v. Walsh*, 864 F.2d 416, 418 (6th Cir.1988); *San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 255–56 (2nd Cir.1984).

ty turns on the credibility of their accounts of the circumstances that led them to make mistakes of judgment. Heavily credibility—dependent immunity defenses can of course occur in various kinds of § 1983 cases, but they may be most prevalent where the existence of probable cause is determinative. In such cases, substantive immunity doctrine dictates that an objectively assessed state of mind—what a reasonable police officer in the circumstances knew or should have known about and deduced from the relevant events and conditions bearing upon the existence of probable cause—is likely to be wholly determinative of immunity. *See Anderson v. Creighton,* 483 U.S. 635, 640–41, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). For this reason, in these cases more than most, police officers' accounts of the circumstances that led them into mistaken judgments are likely to be determinative. And because inevitably—liability being disputed—the officer's account will be favorable to himself, the credibility of that account is crucial. Frequently, given the nature of police investigations, the officer's account is not subject to direct refutation by anyone, and must therefore be accepted unless it is manifestly implausible in light of the physical facts, or is intrinsically contradictory, or is otherwise drawn in doubt by extrinsic evidence. *Compare, e.g., Torchinsky v. Siwinski,* 942 F.2d 257 (4th Cir. 1991) (officer's directly unrefuted account of victim's false identification of assailant determinative of officer's immunity), *with Sevigny v. Dicksey,* 846 F.2d 953 (4th Cir. 1988) (officer's erroneous perception shown to be unreasonable by failure to question available eyewitness who would have corrected it).

In these "probable cause" cases, it is therefore likely that the quite human temptation on the part of police officers to engage in post hoc rationalizations and justifications of their mistakes of judgment may be at its peak—for the very reason that direct refutations of their accounts of the basis for their perceptions of probable cause are so rarely possible. If this be even generally so, the only safeguard for claimants confronted with motions for sum-

mary judgment on qualified immunity grounds, when supported by such self-serving accounts, is a rigorous adherence by the courts to the rudiments of summary judgment doctrine. That means, very simply, keeping in mind that the burden is on the police officer as movant for summary judgment, and that where, as in this situation, the basis for the motion is an affirmative defense as to which the movant would have the burden of persuasion at trial, the summary judgment burden is a correspondingly heavy one. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 330–31 & n. 2, 106 S.Ct. 2548, 2556–57 & n. 2, 91 L.Ed.2d 265 (1986).

The procedural burden thus imposed by summary judgment doctrine upon § 1983 defendants claiming qualified immunity obviously pushes against relevant substantive and procedural immunity doctrine. For immunity doctrine is heavily weighted, substantively and procedurally, in favor of the state actor—avowedly to protect her not only from ultimate liability, but from even having to go to trial. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). This is done substantively by providing a defense that is broader—by excusing constitutional violations resulting from reasonable mistakes of judgment—than is the defense on the merits, *see Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2737–38, 73 L.Ed.2d 396 (1982), and procedurally, by permitting interlocutory review and reversal of trial court judgments rejecting the defense, in order to avoid trial. *See Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

The conflicting thrusts of summary judgment and qualified immunity doctrine on this matter have led some courts to tinker somewhat with summary judgment practice to relieve its burden on defendant-movants. *See, e.g., Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 647–49 (10th Cir.1988) (where § 1983 defendant's subjective intent an element of constitutional claim, heightened burden placed on non-movant to avoid summary judgment motion on qualified immunity

grounds). But the great majority of courts, including the Supreme Court, *see Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737, and this court, *Turner v. Dammon,* 848 F.2d 440, 443 (4th Cir.1988), have held—or simply assumed as an evident proposition—that summary judgment practice is not to be varied, but applied in the regular way in assessing a qualified immunity defense. *See* Note, *Qualified Immunity and the Allocation of Decision–Making Functions Between Judge and Jury,* 90 Col.L.Rev. 1045, 1052–53 & n. 49 (1990) (collecting and analyzing decisions).

This means that in this context as generally, despite the desirability, if possible, of avoiding trial where qualified immunity is asserted, this is not always possible. In this context, as generally, if there are genuine issues of material fact respecting the reasonableness of the police officer's asserted perception that probable cause existed, the defense may not be established by summary judgment, but must go to trial. There it may yet provide the officer a defense broader than that available to him on the merits, but only there may it be found established.

Facially faithful to Supreme Court and Fourth Circuit precedent, the majority seemingly accepts that summary judgment practice should apply in its regular course here. Certainly it nowhere disputes that proposition. But neither does it expressly recognize or demonstrate any sensitivity to the implications of that proposition for the way in which the widely conflicting forecasts of evidence should be assessed here. Instead, drawing heavily and repeatedly on broad policy considerations underlying qualified immunity doctrine, the majority essentially, though without ever saying so, shifts the burden to the plaintiff as non-movant, either resolving conflicting inferences arising from conflicting versions of critical historical facts in favor of the defendants in an exercise of raw factfinding, or simply sweeping aside as immaterial the existence of flat conflict in the evidence as forecast on certain critical issues. With all respect, I think the majority, out of concern that summary judgment doctrine, regularly applied, might thwart the underlying purposes of qualified immunity doctrine, has simply declined here to apply those aspects unfavorable to the defendants with full and proper rigor.

That is a serious suggestion that should be supported. I will focus on two specific instances and put them in the context of a more general assessment.

Absolutely critical to any fair assessment of whether a reasonable police officer in the circumstances would *in the end* have thought there was probable cause to take Ms. Gooden into custody, is the question whether the apartment neighbor, Cummings, did, as he claimed under oath, tell the police officers in Beck's apartment before they took Ms. Gooden away, that they "had the wrong person," identifying a quarreling couple in the apartment just *under* Ms. Beck's apartment as the source of the noise of which Ms. Beck complained. Cummings' version is not directly disputed in the record—the investigating officers only say that they do not recall talking with him—but the record indicates they did later investigate the possibility of a domestic disturbance in the lower level apartment.

On this state of the record, there is at least a genuine issue of fact as to whether things occurred as Cummings asserts. This is a material fact, for if it is as Cummings asserts, it goes critically to the ultimate issue whether a reasonable police officer would at that point have believed, without a follow-up investigation, that he *now* had probable cause, whether or not he earlier had. It is undisputed that no such investigation then occurred and that only then, assuming the fact to be as asserted, was Gooden taken involuntarily from the apartment.

The majority fairly recites the Cummings episode in its statement of facts, 963–64, and in the process plainly reveals the existence of the factual issue above identified. But that is the last mention of it. It does not figure in the majority's ensuing legal analysis; there is no effort to dismiss it as not a "genuine" issue or as one not going to a "material" fact. It simply is dis-

regarded, unless it be thought that the majority's casual observation that "it will nearly always be the case that witnesses to a crime will differ over what occurred," 965, is intended to dismiss it as not a genuine issue, or as not concerned with a material fact. Neither properly could be said of this issue.

Equally critical to the ultimate issue is the reasonableness of the officers' asserted basis for ever thinking they had probable cause. This unavoidably turns on which of conflicting versions of Ms. Gooden's conduct and appearance are accepted as the true facts.

According to Ms. Gooden, no loud screams ever came from her apartment; instead, at the critical times she was quietly going about her business, talking on the telephone to a person she identified to the police officers and who could have verified her statement if the officers had sought verification. When the officers came into her apartment, she was not disheveled or in any emotional state suggesting recent behavior violent enough to shake the floor and walls of her apartment.

According to the police officers, the loud screams seemed unmistakably to come from Ms. Gooden's apartment as the complainant Ms. Beck suggested to them, and Ms. Gooden's appearance was such as to confirm that she may indeed have been engaged in recent violent physical behavior involving screams alternately in female and male voices and throwing herself against the walls.

As matters turned out, it is clear that Ms. Gooden's version of these critical facts is the true one, and that, as the majority concedes, the officers were simply mistaken throughout. The real question, however, is whether their mistake was a reasonable one, or whether it resulted from such irresponsible and unprofessional conduct that it could not be considered reasonable.

The majority's approach on this critical matter is simply to disregard the fact that if Gooden's version is the true one, the very credibility of the officers' version is necessarily drawn in serious issue. Instead, the majority simply accepts at face value everything the police officers say they heard and saw and thought, and concludes that "there is little dispute here about what the officers perceived." 965.

With all respect, I think the officers' obviously self-serving version of what they actually perceived—not to say what a reasonable officer in their position should have perceived—could only be accepted as fact by an exercise of raw factfinding on this record. As indicated, that version is disputed by critical aspects of Ms. Gooden's conflicting version of her conduct and appearance. It is drawn in further issue by the ready ability of another apartment dweller to locate the source of the commotion in another apartment adjoining the Beck apartment. Perhaps most tellingly, though indirectly, it is drawn in issue by the police officers' bizarre invocation of a complicated psychological concept that surely is beyond their ken—the split personality disorder—to explain their continued belief that Ms. Gooden, though found peaceably alone in her apartment, nevertheless was the source of the recent "bloodcurdling" screams by male and female voices and the violent shaking of walls and ceilings.

The majority's analysis simply disregards this evidence drawing in issue the essential credibility of the officers' account of what they actually saw and heard, or should have seen and heard. Any possible discrepancies in that account (though none ever are conceded) are explained away as the result of the general exigencies of police work in responding to fast-moving emergency situations or as understandable decisions, taken under pressure, to err on the side of caution for their own and a citizen's sake. That is a perfectly accurate description of the type of dangerous emergency situations which beleaguered police officers—particularly in these times—do frequently encounter and which provide legal excuse, in the form of immunity, for their resulting mistakes. The problem with it here is that it is only an accurate description of the situation in issue if the

officers' version is a credible one—the very fact in issue.

The majority's description of the circumstances could turn out to be an essentially true one: of hard-pressed officers, reasonably relying on available evidence, making a reasonable decision after responsibly checking their perceptions with the investigation possible under the exigencies of the moment. But on this record, there is at least an equally plausible, opposite possibility: of police officers acting too quickly, whether from callousness or indifference, or whatever, to accept the suggestions of an obviously upset apartment dweller; then disregarding, again whether from callousness or indifference, or whatever, all the evidence that questioned their first assumptions including a direct suggestion by an eye-witness that they were mistaken, with a proffer of the true facts; then covering up their mistake by shadings of the facts of what they actually saw and thought, and did or did not do to verify their initial assumption.

I stand on my assessment, and that of the district judge whose decision is now reversed by the en banc court, that summary judgment could be granted here only by failing properly to apply summary judgment principles.

## II

The importance of this case—beyond its obvious impact on the litigants—lies in the classic problem it poses of accommodating qualified immunity doctrine's preference for pre-trial establishment of the defense, with summary judgment's insistence that, desirable as this may be, it cannot be done if genuine issues of fact material to the defense exist.

This dissent suggests—though with all respect for the difficulty of this problem— that the majority here has succumbed to what may be a rather widespread temptation to put another finger on the scale favoring pretrial establishment of immunity—by skewing summary judgment doctrine. I think this is wrong, and not needed to realize the vital purposes of qualified immunity. More important, it disserves

the rights of a § 1983 claimant not to be foreclosed in this way.

Chief Judge Ervin, Judge Murnaghan, Judge Sprouse, and Senior Judge Butzner have asked to be shown as joining in this dissenting opinion.